STATE OF NORTH DAKOTA, Respondent, v. MARTIN E. MATTSON, Appellant.

(206 N. W. 778.)

**Criminal law — testimony as to statements made by alleged conspirators with accused, held incompetent.**

1. The testimony of witnesses relating to certain statements made to them by one Jondahl and one Mabel Anderson, whom it is claimed had entered into a conspiracy with defendant to commit the offense, was incompetent regardless of whether conspiracy had been proved or not for the reason that they were not made in the presence of the defendant and they related to acts previously done, or to be done in the future, and were not made in furtherance or in prosecution of the common purpose, following State v. Moeller, 20 N. D. 114.

**Criminal law — testimony relating to statement made by alleged conspirator not in accused presence, held incompetent.**

2. Testimony of witnesses relating to statements made by Jondahl before

Note.— (1, 2) Admissibility of declarations of one upon whom an abortion is committed, against others charged with complicity therein, see annotation in 35 L.R.A.(N.S.) 1084; 1 R. C. L. pp. 518, 520; 1 R. C. L. Supp. pp. 184, 185; 4 R. C. L. Supp. p. 39; 5 R. C. L. Supp. 28; 6 R. C. L. Supp. p. 23.

conspiracy with the defendant, not in his presence, and statements made by Jondahl after the death of Mabel Anderson, were incompetent, hearsay and prejudicial error as against the defendant Martin E. Mattson, following State v. Moeller, supra.

Opinion filed August 26, 1925.   Rehearing denied December 23, 1925.

Criminal Law, 16 C. J. § 1306 p. 656 n. 96; § 1318 p. 661 n. 61; § 1330 p. 665 n. 10.

Appeal from judgment and order denying motion for a new trial, in District Court of Grand Forks County, *Cooley, J.*

Reversed and remanded for a new trial.

*Sinkler & Brekke,* for appellant.

Except so far as the character of the accused for veracity may be attacked when he is a witness, the state cannot show his bad character in the first instance.   Underhill, Crim. Ev. 3d ed. § 137.

It is important to distinguish between evidence of reputation to show character and direct evidence of the good or bad moral disposition of the accused.   Evidence of a good disposition is not admissible for him to mitigate or excuse his act, or of a bad or malicious disposition to show the probability of guilt.   Underhill, Crim. Ev. 3d ed. § 144.

The evidence offered and received certainly, in addition to showing the bad character of the defendant tended to show that he was engaged in the commission of the crime of abortion at a period two years prior to the time of the alleged commission of this offense.

Generally it is error to admit evidence independent of the crime charged of other offenses or prior to the conviction for other offenses. Underhill, Crim. Ev. 3d ed. §§ 150 et seq.

The law does not permit the state to go outside of the issues and to introduce evidence of other separate and extraneous offenses of the misconduct of the defendant which has no natural connection with the pending charge, and which are intended to prejudice the defendant in his defense.   Dunn v. State, 70 N. E. 521; Munson v. State, 121 Pac. 438; Porter v. State, 91 N. E. 340.

Statements of an alleged co-conspirator regardless of whether a conspiracy has been proved or not, are incompetent where they are not made in the presence of the defendant, relate to acts previously done

or to be done in the future, and are not made in furtherance or in prosecution of the common purpose. State v. Moeller (N. D.) 126 N. W. 568.

*Geo. F. Shafer,* Attorney General, *J. B. Wineman,* State's Attorney, and *Philip R. Bangs,* Assistant State's Attorney, for respondent.

If the woman not only consents to the operation, but actually seeks and adopts means in furtherance of it, her declaration may be admitted against the accused as the declarations of a fellow conspirator made to promote the common design. Underhill, Crim. Ev. § 534; State v. Power, 24 Wash. 34, 63 L.R.A. 902; State v. Dickinson, 41 Wis. 299.

Evidence that the accused prior, or subsequently, to the act alleged, had attempted to procure an abortion on the same woman, using the same or different means, or that on other occasions he had operated on other women, or held himself out as being able and willing to commit an abortion, is always admissible to show his purpose and intention in connection with the act charged. Underhill, Crim. Ev. § 531.

It is, too, well established that in order to justify a change of venue or a continuance in those jurisdictions where a continuance is authorized, the excitement of public prejudice must be such that its natural tendency would be to intimidate or swerve the jury; and as the court in which the cause is pending can much better determine the propriety of a postponement on this ground than the appellate court, it requires very strong showing to induce the upper court to interfere. State v. Gordon, 32 N. D. 31; Johnson v. State (Okla.) 97 Pac. 1059.

BURKE, J. The defendant in this action was convicted of the crime of murder in the second degree, committed on the person of one Mabel Anderson, a pregnant woman, by means of medicine and instruments, without any design to take her life, while attempting to procure a miscarriage, the same not being necessary to preserve her life. The defendant specifies 97 errors, largely relating to the admission of testimony of witnesses detailing conversations had with Mabel Anderson and with Sydney Jondahl, who it is claimed were co-conspirators with the defendant Mattson, and, therefore, claimed by the state to be admissible as against the defendant Mattson.

The appellant contends, first, that Mabel Anderson, the victim, was not a co-conspirator, but there is no merit in this contention in this

state for under § 9605 of the Compiled Laws of 1913 it is a crime for a woman to solicit, or submit to, any operation, or to use any means with intent to procure a miscarriage.

The appellant further contends that a large part of the testimony of Mrs. Minnie Ranstrom, mother of Mabel Anderson, testifying to conversations with her daughter, was not in furtherance of the conspiracy and was highly prejudicial to the defendant who was not present during the conversations. As an example of her testimony she is asked:—

Q. Did she (meaning Mabel Anderson) say she had any trouble of any kind?

To which there was an objection that same was hearsay, immaterial and incompetent. The objection being overruled she answered:

A. She told me that she was in trouble with Sidney Jondahl, that he was the cause of it; that she was in family trouble; that she was in the family way and that Sydney Jondahl was the cause of it. She said she was going to a doctor and I told her not to go. She said "There is no danger, for Sydney is taking me. He is to pay the doctor $50."

Q. Did she tell you who the Doctor was?

Ans. Yes, she said—

Objected to as hearsay.

Overruled.

A. She said she did not know his name or telephone number but he was to be found in the basement of the auditorium.

This is almost in the same language of the witness Paulsrud in the case of State v. Moeller, 20 N. D. 114, 126 N. W. 568. Dale confided to Paulsrud the fact that he was looking after a girl who was at the hotel and who was in trouble and that he employed Dr. Moeller to relieve her, how much he was to pay him, when it was to be done, and her condition afterward.

Again,—

A. On New Year's Day I asked her where she had been and she said "At the basement of the auditorium." She said she did not feel good and said, "I think the doctor gave me too big a dose of medicine." When she came back on the 1st I noticed the smell of turpentine and

I asked her if she was using turpentine and she said that was off the medicine he was giving her.

Q. Well, did she say anything to you about the doctor at the auditorium telling her she should not tell anybody about his giving her treatments?

Objected to as leading, suggestive and hearsay.

Court: Well, it seems somewhat leading.

Wineman: I will ask that in another form.

Q. State what your daughter told you the doctor said to her about taking treatments?

Objected to as leading and suggestive.

Overruled.

Q. Did she tell you as to the number of cases he was treating?

Objected to as leading and hearsay.

Overruled.

A. She told me he said he had two other cases and that one of the cases went through all right but that one of the cases, the girl went to a doctor and that she took sick and got typhoid fever and died, and that that case cost him $1,500.

Q. Did she say anything to you as to what the doctor at the auditorium charged for his services?

Objected to as immaterial, irrelevant, incompetent, leading and suggestive.

Overruled.

A. She said Sydney was to pay the doctor at the auditorium $50.

Q. Now, did Mabel Anderson tell you during the time she was going to the auditorium how the doctor treated her?

A. She said he injected medicine into her.

These conversations were all had at the home of Mrs. Ranstrom and not in the presence of the defendant.

Mary Berg, after the death of Mabel Anderson, had a talk with Jondahl at the city hall and states:

"He said 'It was the funniest thing, the girl took sick and got sort of faint and I took her into the auditorium.' I asked him, 'Where were you going?' He said 'Just out for a walk.' He said she had been doctoring and had been taking some quinine."

Dr. Alfred Fortun had a conversation with Jondahl on the 11th of December, and there is no evidence of any relations between the defendant and Sydney Jondahl and Mabel Anderson before the last of December, 1923. The doctor testified that Mabel Anderson had come to him for relief and that about a week later Sydney Jondahl called and asked if Mabel Anderson had been there. Further, he wanted to know if something could not be done.

I advised him to get married.

Q. What did he say to you?

Objected to as being immaterial, incompetent and irrelevant. Overruled.

A. He said at the present time he did not have enough money to afford to get married. He said since he had been thinking it over he felt that he was not responsible. That was his other objection to getting married.

R. A. Vaaler, called as a witness on the part of the state, testified:

Jondahl came into Vold's Drug Store where I was employed and asked if he could get 4 or 5 grains of, or capsules of, quinine. I went and put them up and labelled the box. He started to button up his coat, he had his uniform on. Then he said "I am going out for a little time to-night with some ex-service men but I have a girl up a tree and I have to attend to her tonight." He said "This is good for that, isn't it?" I said, "Good for what?" And he said "Good for pregnancy pains?" I said "It can be used that way." He said "Have you got anything better?" and I said I had not. I said, "What is it, a little delay?" And he said "No, she is three months gone" and then he said "I have a friend working on her, he has used instruments twice."

Moved to strike out as hearsay.

Wineman. Go ahead.

A. He said "I have a friend working on her with instruments, and he has given her two treatments, and we have a white discharge coming now. Decay has set in." He said "This fellow is not a doctor but I guess he knows his business. He said he had a lot of cases before."

Schwam: Before I take the witness the defendant moves to have the testimony with reference to Mr. Jondahl and Mr. Vaaler's conver-

sation with reference to a third person stricken out on the ground that it is hearsay.

Court: Overruled.

The witness Gunda Johnson had a conversation with Jondahl in which she is asked if he said anything to her about Mabel Anderson.

Objected to as irrelevant, incompetent and immaterial.

Overruled.

A. Yes.

Q. What was that?

Objected to as hearsay.

Overruled.

A. He said he had an appointment with the doctor; that he was going to take Mabel Anderson to the doctor.

A. Sydney Jondahl called on me on the night of January 3d, 1924.

Q. Did not Sydney Jondahl tell you at that time how Mabel Anderson died?

A. He did not know.

Q. What did he say?

Schwam: Objected to as—well—

(No ruling.)

A. He was wondering what Mattson did to her to make her so sick.

Harold Hedigan, a witness for the state, in answer to the question;

Q. What did you say to him?

Defendant objects to the witness answering the question if, in his answer anything was said by Sidney Jondahl with reference to Mr. Mattson, as being hearsay.

Overruled.

A. I just said to him "Who was that girl you were with at the depot?" He said: "That was my girl." He said he had her in the family way and was taking her to the doctor. I said to him "Why don't you marry her?" and he said "I don't want to marry her. I don't want to be tied down."

Joseph Neward, on the part of the state, said he had a conversation with Jondahl as follows:—

"He was telling me about a girl that he had in a fix and he showed

me some pills and asked me if I had ever seen anything like that and I said 'No.' He had this box of pills and he was a little leery of giving them to her. He was afraid she would take an overdose of them."

Moved to strike out the answer as being a conclusion of the witness; to strike out the latter part "he seemed to be afraid, etc."

Court: The latter part of the answer may be stricken out.

Q. Did he say what the pills were for?

A. He just said the girl was taking the pills and he had the box, that was all.

None of these conversations were had in the presence of the defendant and the conversation with Mary Berg and Gunda Johnson were after the girl was dead and there was no longer any conspiracy.

The statements of Mabel Anderson to her mother and the statements of Jondahl to the different witnesses nearly all relate to things that had been done and what it was proposed to do. While the statements made by Jondahl to Dr. Fortun were made long before there were any relations between the defendant Mattson and Mabel Anderson.

In the case of State v. Moeller, 20 N. D. 119, 126 N. W. 570, this court says:—

"It is shown that Dale had a slight acquaintance with the witness Paulsrud; that they met at the Leland Hotel in Minot, where both were stopping, on Saturday, the 3d of October, 1908, and conversed together on that day and on Sunday, the 4th, and Monday, the 5th, and that in their conversations Dale confided to Paulsrud the fact that he was looking after a girl who was at the hotel and who was in trouble, and that he had employed Dr. Moeller to relieve her, how much he was to pay him, when it was to be done, and her condition afterward. None of these conversations were in the presence of the defendant, and, with possibly one exception, not necessary to consider, all related to what had been done or what it was proposed to do. The court permitted Paulsrud to testify to these conversations, and the charge quoted to the jury is in harmony with the theory that this evidence was admissible."

And on page 120 the Court says:—

"Acts and declarations of conspirators who are not on trial are sometimes admitted in evidence against a co-conspirator who is being prose-

cuted. The principle upon which such acts and declarations are admitted in evidence is that by the act of conspiring together the parties doing so have generally assumed as a body the attribute of individuality as relates to the prosecution of the common design or purpose, and that what is done or said by any one in furtherance of that design is a part of the res gestæ, and therefore the act of all. They are also admissible on the ground of agency. Most authorities are to the effect that a prima facie conspiracy must be established before the declarations of the co-conspirator are admissible, though some hold that the order of proof relating to it is subject to the discretion of the trial court. If the acts or declarations of the co-conspirator are not in furtherance of the common purpose, they are not admissible in evidence. Declarations made prior to the formation of the conspiracy, or those made after its execution, and declarations made relating to what the conspirators propose to do, by a co-conspirator, and not in furtherance of the common purpose, are inadmissible. State v. Walker, 124 Iowa, 414, 100 N. W. 354; Nicolay v. Mallery, 62 Minn. 119, 64 N. W. 108; State v. McGee, 81 Iowa, 17, 46 N. W. 764; People v. McGarry, 136 Mich. 316, 99 N. W. 147; Spies v. People (the Anarchist Case) 122 Ill. 1, 3 Am. St. Rep. 320, 12 N. E. 865 and 995, note 4, 17 N. E. 898, 6 Am. Crim. Rep. 570, and cases cited therein; State v. De Wolfe, 29 Mont. 415, 74 Pac. 1084; State v. Thibeau, 30 Vt. 100, and cases cited in note thereto in 10 Vt. Rep. Anno.; People v. Stanley, 47 Cal. 113, 17 Am. Rep. 401; People v. Davis, 56 N. Y. 95; Lawrence v. State, 103 Md. 17, 63 Atl. 96; State v. Crofford, 133 Iowa, 478, 110 N. W. 921, id. 121 Iowa, 395, 96 N. W. 889; Patton v. State, 6 Ohio St. 468; Fouts v. State, 7 Ohio St. 472. As this principle applies to the instructions of the court to the jury, it is apparent he wholly omitted to include the essential element that the declarations of the co-conspirator, even conceding the conspiracy to have been shown, must have been made in furtherance of the object of the conspiracy. This constitutes reversible error. Applying this principle to the testimony of the alleged co-conspirator, it is enough to say that, with the exception of one question, which may have been proper, but which standing alone was entirely inadequate to connect the defendant with the crime, it may be divided into two classes: The first relates to certain acts of the defendant, what was planned to be done, why it was to be done, and

what had been done and the result. With the exception of the one question referred to, none of these declarations were pertinent to the carrying out, or in furtherance of, the enterprise. The witness and Dale met casually. They had a slight acquaintance. They took walks on the street together and conversed in the hotel, but the witness was not asked to and did not participate in any of the plans. The statements which he testifies Dale made were not made with a view of or to aid in carrying out the illegal conspiracy, if any existed. They were simply recitals of what had been done, and what it was proposed to do, without any disclosed purpose. They were also made without any opportunity for the defendant to cross-examine Dale, and not in defendant's presence. We are unable to discover any principle sustained by authority warranting the admission in evidence of these declarations, with the possible exception of two or three cases, where loose statements of the courts have indicated that statements of a co-conspirator were admissible, without distinguishing why admissible, and we think based upon facts making it unnecessary to do so."

The evidence in the case at bar is clearly incompetent and much more damaging than the evidence referred to in State v. Moeller, supra. Not only does it relate to things that had been done in the past and to things that were to be done in the future but some of it related to conversations had before the alleged conspiracy and some after.

Since there must be a new trial we deem it unnecessary to consider other specifications of error as they are not likely to occur in another trial. The case is reversed and remanded for a new trial.

CHRISTIANSON, Ch. J., and BIRDZELL, NUESSLE, and JOHNSON, JJ., concur.