[File No. Cr. 143.]

STATE OF NORTH DAKOTA, Respondent, v. J. M. PHILLIPS, Appellant.

(277 N. W. 609.)

Opinion filed January 15, 1938.

*F. T. Culhbert* and *C. E. Joseph,* for appellant.

*P. O. Sathre,* Attorney General, and *J. J. Kehoe,* State's Attorney, for respondent.

MORRIS, J. This case comes to us on appeal from a judgment of conviction of the defendant for second degree murder. The first question to be considered involves the place of trial. The information charged the commission of the crime in Towner county. Affidavits of prejudice against both the judge and county were filed. The Supreme Court designated a trial judge who heard the defendant's application for change of place of trial and denied it. The trial was had in Towner county over the objection of the defendant.

The law under which the trial court acted is chapter 215, Session Laws of North Dakota for 1927, and reads as follows:

"That § 10,766 of the Compiled Laws of North Dakota for the year 1913, be amended and re-enacted to read as follows:

"Section 10,766. Whenever an affidavit for a change of judges is filed in a criminal action, in accordance with the provisions of chapter 331 of the 1923 Session Laws, and the party also asks for a change of the place of trial, upon any ground specified in § 10,756 of the Compiled Laws of North Dakota for the year 1913, the court shall proceed no further in the action, and shall thereupon be disqualified to do any further act in said cause; and in such case, the application for a change of place of trial shall be heard and determined by the Judge designated by the Supreme Court to act in said action; provided that such affidavit shall be filed in duplicate not less than five days before the opening day of the term at which such action may be tried, except

in cases where the defendant is held to the District Court for trial after said time."

The defendant contends that under § 10,766, Compiled Laws of North Dakota for 1913, "a double affidavit charging prejudice of the court and the county was mandatory, and required the removal of the cause to some other county and the hearing of the case by some other judge," and that this is still the law despite chapter 215, supra. The trial court was of the opinion that since the enactment of chapter 215, the filing of the double affidavit no longer made the change of place of trial mandatory, and that the trial judge appointed by the Supreme Court, might, upon hearing an application for change of place of trial, deny such application and grant no change, or grant the application and designate the county to which the case should be transferred for trial. Some confusion has developed regarding the change of place of trial as between civil and criminal actions due to the enactment of chapter 1, Session Laws of 1919, chapter 129, Session Laws of 1921, and chapter 331, Session Laws of 1923. These enactments are discussed at considerable length in State v. Craig, 54 N. D. 5, 208 N. W. 394. It is unnecessary to discuss them here for as was said in State v. Craig, supra: "Considering the entire content of the acts of 1919, 1921, and 1923, we deem it to be reasonably clear that the legislature dealt only with affidavits of prejudice against the judge who would otherwise preside at the trial and not with affidavits filed for the double purpose of securing a change of judge and a change of the place of trial. Such has been the uniform construction of these statutes by this court whenever called upon to designate judges following the filing of affidavits of prejudice. . . ."

Thus the provision of § 10,766, Compiled Laws of 1913, making it the mandatory duty of the court to order an action removed for trial to some other county when an affidavit of prejudice was filed against both the judge and the county remained the law of this state until the enactment of chapter 215, Session Laws of North Dakota for 1927. The defendant contends that the sole purpose of this last enactment was to prevent a trial judge against whom an affidavit of prejudice had been filed, from designating the county to which the case should be sent for trial, and to require the new judge designated by the Supreme Court to determine to which county the case should be trans-

ferred, and that the new act did not confer upon the judge designated by the Supreme Court authority to deny the application for change in toto. Under § 10,766, Compiled Laws of North Dakota for 1913, and until the enactment of chapter 215, supra, when an affidavit was filed against both the judge and the county the judge against whom the affidavit was filed heard the application for removal, but was not permitted to deny it. His only discretion lay in designating the county to which removal was had. The 1927 act took the judge against whom an affidavit of prejudice had been filed completely out of the case. He was disqualified to do any further act, and it was specifically provided "the application for a change of place of trial shall be heard and determined by the judge designated by the Supreme Court to act in such action." Had the legislature intended to make a change of place of trial mandatory under the 1927 act, it could easily have so provided as it had done in Section 10,766. The omission of mandatory language is an indication of an intention on the part of the legislature to vest in the judge designated to act in the place of the one disqualified, authority to hear and determine the application with respect to two essentials, first, whether a change of place of trial should be granted at all, and second, if a change was granted to what county the case should be transferred.

Whether a change of place of trial should be granted rests within the sound judicial discretion of the trial court, and in the absence of a showing of abuse of such discretion, the denial of the application is not error. State v. Winchester, 19 N. D. 756, 122 N. W. 1111; State v. Potter, 60 N. D. 183, 233 N. W. 650. No question of abuse of discretion is here presented.

The defendant argues that chapter 215, Session Laws of 1927, does not specifically repeal the law as it existed under § 10,766, Compiled Laws of 1913, making an affidavit of prejudice filed against both the presiding judge and the county mandatory in requiring a removal of the trial of the case from the county against which prejudice was allowed, and that since repeals by implication are not favored, the law in that respect stands unchanged. The rule regarding repeals by implication does not apply in this case. Section 10,766 is specifically amended and re-enacted by the 1927 law. The exact field which was covered by the provision in the old law making removal from the

county mandatory is covered by the new act in this language, "the application for a change of place of trial shall be heard and determined by the judge designated to act in said action." We construe this language to mean that the judge has power to grant or reject the application as well as to determine the county to which the case should be sent for trial in event the application is granted. "The power to hear and *determine,* includes power to reject as well as to allow." Cole v. State, 102 N. Y. 48, 6 N. E. 277.

The state seeks to prove that the defendant unlawfully produced a miscarriage of one Muriel Samski, resulting in her death on October 31, 1935. The deceased lived in Dunseith, North Dakota. The defendant resided and practiced medicine at Bisbee. The defendant contends that the court erred in permitting testimony to be given concerning statements made and acts done by the deceased prior to the commission of the alleged abortion which, if performed, occurred on or shortly after October 7, 1935. The defendant also contends that the court erred in its instruction to the jury regarding this testimony, which instruction is as follows: "Some testimony has been offered in this case tending to show statements made by Muriel Samski prior to the commission of the alleged abortion. I charge you that such testimony may be considered by the jury only as bearing upon the existence of a design or plan in the mind of Muriel Samski, at the time such statements were made, if made, to have an abortion performed, merely for the purpose of showing that the abortion was probably done as planned. Testimony of acts done by Muriel Samski prior to the alleged abortion tending to show the existence of a design or plan to have an abortion performed may also be considered by the jury for the same purpose and no other. Before the jury may consider such statements and acts the jury should be satisfied that they were made and done in a natural manner and not under circumstances throwing doubt or suspicion on what her intentions really were at the time."

The first statement of the deceased appears in the testimony of Glen Miller, who says that she told him of her condition on September 20 and said that she wanted to see Dr. Phillips to get rid of the child. Miller also testifies that on or about Monday, September 23, he took her to Bisbee to see Dr. Phillips. He was not home. Miller and the

deceased stayed in the town of Bisbee, in which the defendant had his home and office, until he returned about 9:30. Miller then says,

"A. I told Mr. Phillips right out that there was a girl out in the car that was in the family way, and she said she heard that he did that kind of work, and he could get rid of the child for her. Mr. Phillips said, 'Yes, I have had similar cases like that.' I asked him what he would charge. He says, 'It varies from probably sixty to eighty-five dollars,' and he says, 'Where is the girl?' I says, 'In the car.' He said, 'You send her in.' I went out and told her. She went in and I stayed in the hall."

Thus Miller's testimony shows that the deceased carried out her plan to see the defendant.

Another witness was permitted to testify that about two days before the deceased went to Bisbee with Miller she told this witness that she thought she was in a family way and was going to see Dr. Phillips at Bisbee to see if he wouldn't help her. Evidence of other statements of the deceased of a similar import to those above mentioned made by the deceased after her first visit to Dr. Phillips and prior to her miscarriage, were admitted. The admission of this testimony and the instructions are so closely related that we will consider them together. The defendant contends that statements of the deceased such as are involved here are not admissible unless it is shown that there is a conspiracy to commit an illegal act, that the defendant is a party to the conspiracy at the time that the statements are made, and that they are made in furtherance of the object of the conspiracy. The defendant asserts that no conspiracy has been shown and that even if there appears to be such conspiracy, the court erred in admitting evidence of statements made prior to its inception and after its consummation, and of statements which were not in furtherance of the object of the conspiracy. The defendant further contends that he was entitled to have given his requested instruction to the effect that any statements of the deceased admitted in evidence, must have been made in good faith as a part of the res gestæ and connected with the carrying out of a conspiracy previously shown to have existed, and must not have been a mere recital of things done by the defendant or the deceased or a recital of her acts or intentions. As we read the rulings of the court and his instructions, the questioned testimony was not admitted and

the jury was not instructed thereon under the theory of conspiracy as was done in State v. Moeller, 20 N. D. 114, 126 N. W. 568, and State v. Mattson, 53 N. D. 486, 206 N. W. 778. Evidence of the nature of that which we are now considering is admissible in homicide cases when it tends to show the existence of a design or plan to do a specific act on the part of the deceased, when the design, plan, or act of the deceased is relevant to the issue being tried. A number of cases are illustrative of this doctrine. In the case of State v. Dickinson, 41 Wis. 299, "The prosecution sought to prove that on the 8th day of January, being Saturday, the deceased, in the afternoon, went from the Gleissner House to the house of the defendant for the purpose of having an operation for abortion performed upon her, and, among other witnesses, called Mary Erickson, who testified to loaning deceased $10 that day, and as to conversations had with deceased when she loaned the money; stated what the deceased said she was going to do with it, and where she was going that afternoon, and for what purpose. The witness was also permitted to testify as to conversations had with the deceased on the previous Wednesday and Friday, either before or after the deceased had been out and had returned to the hotel. In these conversations the deceased stated that she understood or had found out that she was in a family way; that she had been to see the defendant about it; had been or was going to defendant to get medicine and syringe; that she had made an arrangement or bargain with defendant to have an operation performed upon her; was to give $25, and was to return to defendant's on Saturday afternoon for the purpose of having instruments used to get rid of the child."

The court, commenting upon the admission of this testimony, said: "It was certainly competent to prove that the deceased went to the house of the defendant at the time it was charged in the information the abortion was produced. Upon the authorities, her intent or purpose in going there might be shown by her declarations then made or previously made; because such declarations became a part of the res gestæ. For it is evident the declarations were connected with the act of her going to the defendant; were expressive of the character, motive or object of her conduct; and they are to be regarded 'as verbal acts indicating a present purpose or intention, and therefore are admitted in proof like any other material facts.' 1 Greenl. Ev. § 108;

Travellers' Ins. Co. v. Mosley, 8 Wall. 397, 19 L. ed. 437; Enos v. Tuttle, 3 Conn. 247; Corinth v. Lincoln, 34 Me. 310; Lund v. Tyngsborough, 9 Cush. 36; Nutting v. Page, 4 Gray, 581; State v. Howard, 32 Vt. 380; Moore v. Meacham, 10 N. Y. 207; People v. Davis, 56 N. Y. 96. It is obvious that the mere act of the deceased going to defendant's house was equivocal; it might be innocent or not; it might warrant the inference that she went for proper treatment of some ailment; the declarations would render her motive clear and intelligible. They therefore seem to us as falling under the denomination of the res gestæ, and were admissible as original evidence as distinguished from hearsay."

State v. Power, 24 Wash. 34, 63 P. 1112, 63 L.R.A. 902, was a manslaughter case growing out of an abortion. A witness was permitted to testify concerning a statement of the deceased that: " 'She said she was in trouble, and was going to Spokane to be treated by Dr. Power.' The court said, 'It is urged here that this testimony was hearsay, not part of the res gestæ, and highly prejudicial to the defendant. The learned trial judge did not admit the testimony generally, nor as a part of the res gestæ of the main transaction. When ruling upon the objection he distinctly and clearly stated in the presence of the jury that it was competent only to explain the purpose of the deceased in leaving home, and as characterizing her act of going, and that he admitted it as explanatory of the nature, character, and object of that act. As thus limited, we think the evidence was properly admitted. It was certainly competent for the state to prove that the defendant left her home to go to Spokane, and that she there sought the defendant and placed herself under his treatment. The preparation she made for going, her condition of health at that time, and her conduct and demeanor, were likewise matters properly admissible in evidence, as a part of the history of the case, and necessary to its general understanding. On the same principle, her declarations made at the time she was preparing for the journey could be shown. They were in the nature of verbal acts, explanatory of what she was doing and of her object and purpose, and are part of the res gestæ of this particular part of the entire transaction.' "

In People v. Wright, 167 Cal. 1, 138 P. 349, the Supreme Court of California, in another manslaughter case, said: "Complaint is

made of the introduction in evidence of the declarations of the woman as to her condition of pregnancy and the purpose of her visit to the doctor. Such declarations are hearsay. They are not admitted, and it would be improper to admit them, as direct proof of the commission of the abortion. They were not so admitted. They were properly admitted as evidence establishing the condition of the woman and the avowed purpose of her visit."

In People v. Northcott, 45 Cal. App. 706, 189 P. 704, the District Court of Appeals followed the doctrine of People v. Wright, 167 Cal. 1, 138 P. 349, supra, in passing upon the admissibility of similar testimony in another homicide case.

In Weightnovel v. State, 46 Fla. 1, 35 So. 856, the court, in considering alleged error predicated upon the admission of testimony similar to that before us, said: "There was no error in the admission of this evidence. It was part of the res gestæ. It was not admissible to prove the substantive fact that the defendant committed the crime, but for the purpose of showing willingness on the part of deceased to have the operation performed, and the existence of an opportunity for defendant to perform it."

As will be noted in the foregoing decisions, the admissibility of the questioned evidence is based upon the plan or design of the deceased to have an abortion performed, which plan or design is relevant to the issues of the case, because its consummation results in the opportunity of the defendant to commit the crime with which he is charged. Thus, both the declarations of intention on the part of the deceased and her acts performed in carrying out her intention, as thus declared, are relevant, and testimony concerning them is admissible if properly circumscribed by the instructions of the trial court. Wigmore, Ev. 2d ed. § 1725.

The instruction complained of is erroneous in that it fails to properly inform the jury as to the proper purpose for which the evidence may be considered. Not only does the trial court say that the statements of the deceased may be considered as bearing upon her design or plan, but also says that it may be considered "for the purpose of showing that the abortion was probably done as planned." The jury may have understood this to mean that they might consider the statements as evidence of the probable commission of the crime by the de-

fendant. We find no authority sustaining the admission of such evidence for that purpose. Under the instruction, the jury may have found that this evidence raised a probability that the defendant performed the abortion when the evidence should have been considered only as tending to show that the defendant had an opportunity to perform it. Proof of actual commission required wholly different evidence. To say that the jury might consider the evidence as showing that the crime was probably committed as the deceased had planned it was prejudicial to the defendant. The plan, if any, was that of the deceased and not of the defendant, and was not substantive proof of the actual commission of the crime. The plan which the deceased had in mind, according to this testimony, was one which afforded the defendant an opportunity to commit the crime and thus became relevant independent of direct proof of its commission by the defendant.

In introducing testimony concerning statements of the deceased the state did not confine its evidence to the design or plan of the deceased. Mrs. Miller was asked concerning a conversation with the deceased about going back to Bisbee. Mrs. Miller testified: "She said Phillips told her to come back on the following Monday; . . . that he would perform the operation." This testimony is hearsay and does not come within any of the exceptions to the hearsay rule. The witness was permitted to testify as to the statements of the deceased concerning what was said by the defendant in a conversation which he had with the deceased. The import of this testimony is to connect the defendant directly with the crime with which he is charged. It has the effect of an admission on his part, yet the deceased, who repeated his purported statement, was not under oath and the defendant had no opportunity to cross-examine her. This testimony was clearly incompetent, and its admission was an error highly prejudicial to the defendant.

Certain declarations of the deceased made shortly before her death were admitted in evidence over the defendant's objection. The first of these declarations is presented in the testimony of Mrs. Murray as to a conversation with the deceased on the afternoon of October 28. The deceased had been in the hospital for about a week. Her fever and pulse were high and her respiration rapid. The witness asked her how she felt, and the deceased replied, "I am very sick. I shall

soon be with my mother. I shall see Jesus." Her mother was dead. The witness then asked the deceased if she expected to get well. The reply was "No." The witness then asked the deceased to tell what happened to her at Bisbee, and the deceased said that the doctor had packed her private parts and had also used something, she didn't know what. The state's attorney then came into the room and handed the witness a paper that is in evidence as exhibit 1, containing fifteen questions or suggestions for questions. The witness then asked the deceased questions from this paper and made notations thereon of her answers and statements. From the answers on exhibit 1, this witness prepared a statement known as exhibit 2 which she left with one of the sisters at the hospital. Exhibit 2 was signed by the deceased in the presence of her father and Dr. Remde on the evening of October 28, the same day that the statements testified to by Mrs. Murray were obtained. Before reading the paper to the deceased the doctor told her she was going to die very soon. He testified: "I took the paper and got down close to the bed where she could hear me, and read portions of the paper, a sentence or two, and asked her if that was the statement she wanted to make." As the portions were read to the deceased she said, "Yes." After the reading was completed the doctor asked if that was what she wanted to sign, and she said, "Yes." She was given a pen and signed the paper. The doctor, the nurse who was in attendance, and the father of the deceased testified that she was lucid the evening that she signed exhibit 2. This exhibit reads as follows:

"I believe that I am going to die. I found out I was pregnant and I went to Dr. Phillips at Bisbee to get rid of it. Mrs. Miller told me to go there. I had some money in Bank at Dunsieth and I took $60 some that I paid the nurse at Dr. Phillips'. They gave me some pills and hypos while there I started to flow there. I was about 2 months pregnant. I went to Bisbee at Dr. Phillips 2 or 3 times. Sis Miller went with me once. I stayed there 4 or 5 days then Dr. Phillips and nurse took me back to Charley Millers at Dunsieth. Glen Miller was the father of my Baby. I did nothing to cause this miscarriage. Dr. Phillips and his nurse did it all during this month at Bisbee."

The deceased died at the hospital on the morning of October 31. The defendant attacks the statements made to Mrs. Murray and exhibits 1 and 2 upon the grounds that they are not admissible as dying

declarations and contends that the deceased, at the time the statements were procured, was not in extremis and conscious of impending death, and further that the deceased was not of sufficient mental lucidity to know what she was saying.

Dying declarations are hearsay. Although they are not made under oath, they are nevertheless admissible because a consciousness of the approach of death produces a state of mind free from motives to misstate. This mental condition is held to furnish an incentive to speak nothing but the truth, which is equal to that of an oath. Thus the truth of dying declarations is circumstantially guaranteed by the solemnity imposed by the consciousness of the approach of what the declarant then believes to be speedy and certain dissolution. Wigmore, Ev. 2d ed. § 1438. The state of the declarant's mind must be shown before the declaration is entitled to be received in evidence. The question of admissibility thus presented is primarily for the trial court. Hill v. State, 194 Ind. 688, 141 N. E. 639; State v. Bricker, 98 N. J. L. 58, 118 A. 747; Crittendon v. State, 157 Tenn. 403, 8 S. W. (2d) 371. In determining whether a dying declaration is admissible both surrounding circumstances and the express language of the declarant may be considered. State v. Hanson, 53 N. D. 879, 207 N. W. 1000; State v. Corson, 109 N. J. L. 144, 160 A. 555; People v. Jones, 130 Cal. App. 717, 20 P. (2d) 713; 1 C. J. S. p. 334; Underhill, Crim. Ev. 4th ed. § 212. In this case the deceased's physical condition together with her statements furnish evidence justifying the trial court in finding that the deceased's statements made to Mrs. Murray and the statements contained in exhibit 2, which were signed by the deceased, were all made under a sense of impending death. The deceased lived until the morning of October 31, but that fact does not render her statements inadmissible. It is the mental state of the declarant with reference to impending death at the time of making the declaration and not the fact of the immediate occurrence of death that makes a dying declaration admissible. State v. Bricker, 98 N. J. L. 58, 118 A. 747, supra; Crittendon v. State, 157 Tenn. 403, 8 S. W. (2d) 371, supra; Dorroh v. Com. 236 Ky. 68, 32 S. W. (2d) 550; People v. Corder, 306 Ill. 264, 137 N. E. 845; Com. v. Lockett, 291 Pa. 319, 139 A. 836.

The defendant also questions strenuously the lucidity of the de-

ceased. The trial court determined that she was competent, otherwise he would not have overruled the defendant's objection. If the deceased at the time she made the questioned statements, possessed intelligence, consciousness, and memory sufficient to know what she was saying and doing and to understand clearly the import of what was said to her, her dying declarations were competent. The evidence is sufficient to show that she possessed these qualifications. The trial court did not err in determining that she possessed sufficient lucidity at the time she made the statements to support their admission in evidence.

The court prepared written instructions. At the close of the charge to the jury, defendant's counsel made an oral request that the jury be instructed "that before they have a right to consider the dying declarations, or dying statements, they must first find that the deceased was of such mental clarity as to know the nature of the statements she was giving and to comprehend the same and their meaning, . . ." The court declined to heed the oral request of defendant's counsel. The court did not err in overruling this request. It was not made in writing as required by § 7620, Compiled Laws of 1913. In any event, it was not error for the court to refuse to instruct the jury as requested. As we have pointed out, the admissibility of the dying declarations, including the question of mental capacity of the deceased at the time they were made, is for the trial court to determine when the declarations are sought to be admitted. After they are admitted their credibility and weight is for the jury. The jury determines these elements by the same rules that are employed in judging the evidence of living witnesses. Underhill, Crim. Ev. 4th ed. § 219. The court gave a general charge on credibility. The defendant was not entitled to a special instruction on the credibility of the statements of the deceased. Although if such instruction had been given, it would not have been improper. The failure to give it was not error.

The defendant argues that there are certain inconsistencies in the declarations of the deceased, particularly with reference to what was done to her to cause the abortion. The deceased related to Mrs. Murray certain things that were done to her, and stated other things in the written statement which she signed. These statements are not necessarily inconsistent. Neither statement may have been complete

in itself. She does not purport to relate in either statement all of the things that were done. Both statements may be entirely correct, but even if they were inconsistent they would not for that reason be inadmissible. The inconsistencies would only affect their weight and credibility, and would not affect their admissibility, their truth or falsity being for the jury. State v. Hall, 134 S. C. 361, 133 S. E. 24; Richards v. State, 82 Wis. 172, 51 N. W. 652.

The defendant challenges the sufficiency of the evidence to support the verdict. Since a new trial must be had because of errors at law, no useful purpose will be served by reviewing the evidence in detail. We have examined the record and are satisfied that it contains sufficient competent evidence to support the verdict. Other errors are specified by the appellant, but they are either without merit or present questions unlikely to arise on a retrial of the case.

Reversed and a new trial ordered.

CHRISTIANSON, Ch. J., and NUESSLE, J., concur.

SATHRE, J., did not participate.

BURR, J. (dissenting). The judgment is reversed on two main grounds.

Referring to the challenged instruction it is said: the instruction "fails to properly inform the jury as to the proper purpose for which the evidence may be considered," and that "under the instruction, the jury may have found that this evidence raised a probability that *the defendant* performed the abortion when the evidence should have been considered only as tending to show that the defendant had an opportunity to perform it."

To my mind the instruction is not open to this criticism. The court was dealing solely with "the existence of a design or plan in the mind of Muriel Samski, at the time such statements were made. . . ." The court was not referring to the defendant. The state sought to prove a mutual arrangement between Miss Samski and the defendant for the purpose set forth in the information, and the court limited this testimony to her part of the joint purpose. If the abortion per-

formed was not the one agreed upon by the parties, the jury was not to consider her statements. This is the purport of the charge.

It is futile to say no conspiracy to commit the crime was shown. This abortion could not have been committed without an agreement between the defendant and the girl that the criminal act should be committed—each assisting. The evidence shows it was planned between them.

The exception does not in any way incorporate the thought or idea suggested in the opinion. It says: "The court erred in so instructing for the reasons that statements made by the said Muriel Samski were not binding upon the defendant; that there was no conspiracy shown, that the same were purely hearsay, and not a part of the res gestæ, and that the court failed to instruct that the jury must first find that there was a conspiracy between the said Muriel Samski and the defendant; and that any statements so made by the defendant must have been made in good faith without any ulterior motive and were a part of the res gestæ act connected with their carrying out a conspiracy previously shown to have existed, and the court should further have instructed that any testimony relating to statements made by the said Muriel Samski must not have been a mere recital of things done by her, the defendant, or a recital of her acts or intentions."

The defendant did not request the court to instruct in accordance with the language of the exception or the ideas therein expressed. Nor did he except on the ground that the instruction failed to "properly inform the jury as to the proper purpose for which the evidence may be considered."

It is difficult to see how the jury could take this charge and infer therefrom "a probability that the defendant performed the operation." The inference they would draw from it was that there was a definite purpose to have an abortion performed, but unless the abortion actually performed was the one so planned, the evidence was not to be considered. It was directed to the actual result and was not to be considered unless they found that the actual result was the one to which this referred. The excerpts from the Wisconsin, Washington, California, and Florida decisions show the pertinency of the statements.

The second proposition deals with the testimony of Mrs. Miller. Clearly Miss Samski was a co-conspirator. Clearly the statement at-

tributed to her was made not only during the life of the conspiracy, but also in furtherance of it. After the conspiracy is shown statements made by a co-conspirator in furtherance of the conspiracy are admissible. These statements need not be testified to by the conspirator. It is reasonable to argue that these statements could not be used in order *to prove a conspiracy;* but where the conspiracy is proved by independent testimony, as in this case, then the statements made by a conspirator, no matter to whom they are made, if made during the life of the conspiracy and in furtherance thereof, or as part of res gestæ, are admissible. Now this conspirator was dead and the testimony of Mrs. Miller is as to statements made by the conspirator.

There was no specific objection to this testimony quoted and found on page 258 of Vol. I. of the transcript. The witness was testifying as to her acquaintance with the deceased. The matter deemed objectionable begins on page 256 where she testified the deceased said she was going to see a doctor. A general objection that it was immaterial was overruled. There was some more testimony as to what the girl said when she returned from Bottineau. The objection that this was "wholly immaterial, not binding on the defendant, hearsay" was overruled. After some more testimony there is the following:

"Mr. Cuthbert: I would like a certain amount of objection so that if they are overruled, they are protected anyway.

"The Court: This particular witness, you may have an objection, but on another witness, I would like you to make the objection you care to."

After this generous but somewhat indefinite treatment by Judge Lowe, counsel said that he wanted this objection, "Just for this witness to this line of testimony." I assume this means the line of testimony already entered.

Thereafter the witness stated what the deceased said about going to see the defendant, when this was, when she left, who went with her, when they came back, and a later talk about going back to Bisbee. It was at this time the witness testified:

"A. She said Phillips told her to come back on the following Monday.

"Q. Yes? Anything else said? A. That he would perform the operation."

This was followed immediately with testimony showing the girl left on the following Monday and that she saw her the next Saturday. She testified as to her apparent state of health when she went away, how long it was before she came back, etc. This covered several pages and no objection whatever was interposed other than what has been quoted. As a matter of fact, this subsequent testimony takes four pages of the transcript. In a great portion of this testimony there was many a question asked and many an answer given that no reasonable person would claim was objectionable.

It seems to me that we are reverting to the old system of searching for error sufficient to reverse, when the evidence shows clearly the defendant is guilty. I do not see how any reasonable man can doubt the latter statement.