[No. 29855. Department Two. December 27, 1946.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANK C. HART, *Appellant.*[1]

[1]Reported in 175 P. (2d) 944.

John G. Matthews and Rummens & Griffin, for appellant.

Lloyd Shorett and Max R. Nicolai, for respondent.

STEINERT, J.—By information filed by the prosecuting attorney for King county, defendant was charged in count No. 1 with the crime of abortion, and, in count No. 2, with the crime of manslaughter, alleged to have been committed as part of, and connected with, the transaction set forth in count No. 1. Defendant pleaded not guilty on both charges.

The action was tried before the court and jury. At the conclusion of the state's case, defendant challenged the legal sufficiency of the evidence and moved for a directed verdict of acquittal. The motion was denied. Defendant thereupon renewed a former motion for an order declaring a mistrial, on the ground of misconduct on the part of the prosecuting

attorney. That motion was likewise denied. Defendant then announced that he would stand upon the record and declined to submit any evidence in support of his plea. The cause was thereupon submitted to the jury on instructions given by the court. The jury returned a verdict of guilty on both counts. Defendant subsequently interposed a motion in arrest of judgment or, in the alternative, for a new trial. The motion was denied and judgment was entered on the verdict. Defendant appealed.

In count No. 1 of the information, appellant, Frank C. Hart, was accused of the crime of abortion, alleged to have been committed as follows:

"He, the said FRANK C. HART, in the County of King, State of Washington, on or about the 5th day of March, 1945, with intent to produce the miscarriage of a woman, one Beatrice Fern Fisher, wilfully, unlawfully and feloniously did use certain instruments, which at this time are not known to the Prosecuting Attorney, said acts not being then and there necessary to preserve the life of said Beatrice Fern Fisher, *or of the child with which she was then and there pregnant.*" (Italics ours.)

The statute relating to the crime of abortion is Rem. Rev. Stat., § 2448 [P.P.C. § 113-1], which provides:

"Every person who, with intent thereby to produce the miscarriage of a woman, unless the same is necessary to preserve *her life or that of the child whereof she is pregnant,* shall— . . .

"(2) Use, or cause to be used, any instrument or other means;

"Shall be guilty of abortion . . ." (Italics ours.)

In count No. 2 of the information, appellant was charged with the crime of manslaughter, alleged to have been committed as follows:

"He, the said FRANK C. HART, as a part of the transaction alleged in Count I and connected therewith, in the county of King, State of Washington, on or about the 5th and 6th days of March, 1945, with intent to produce a miscarriage of one Beatrice Fern Fisher, wilfully, unlawfully and feloniously did use or employ certain instruments, which at this time are not known to the Prosecuting Attorney, on the person of Beatrice Fern Fisher, *who at said time was quick with child,*

the said acts not being then and there necessary to preserve the life of said Beatrice Fern Fisher *or of the quick child* with which she was then and there pregnant and as a result of an embolism caused thereby, the said Beatrice Fern Fisher then and there died on the 6th day of March 1945." (Italics ours.)

The statute upon which the last-mentioned charge was brought is Rem. Rev. Stat., § 2397 [P.P.C. § 117-15], which reads as follows:

"Every person who shall provide, supply or administer to a woman whether pregnant or not, or shall prescribe for or advise or procure a woman to take any medicine, drug or substance, or shall use or employ, or cause to be used or employed, any instrument or other means, with intent thereby to procure the miscarriage of a woman, unless the same is necessary to preserve *her* life, in case the death of the woman or of any *quick child* of which she is pregnant is thereby produced, shall be guilty of manslaughter." (Italics ours.)

We have supplied the italics in the foregoing quotations from the information and from the corresponding sections of the statute, because of certain contentions made by the appellant, as will appear later herein.

The uncontradicted evidence produced by the state, although in part admitted over appellant's objections, was as follows:

The deceased, Beatrice Fern Fisher, was a married woman, thirty-six years of age at the time of her death on March 6, 1945. She and her husband, Lyle Fisher, operated a grocery store and gasoline station near Edmonds, in Snohomish county, about seventeen miles north of the business district of the city of Seattle. Mrs. Fisher regularly took an active part in the operations of both the grocery store and the gasoline station, besides attending to her household duties, and for several months prior to her demise had been in good health. Mr. and Mrs. Fisher had three children, aged, respectively, fourteen, thirteen, and four years, all of whom were living with their parents, and the youngest of whom is a girl.

About eight years prior to her death, Mrs. Fisher had an abortion performed upon her by a woman doctor in Seattle; this same doctor had also delivered the oldest of the deceased's surviving children.

About two months prior to her death, Mrs. Fisher again became pregnant. She confirmed her suspicion of this fact by consulting a physician in Edmonds. She determined at that time not to have the expected baby and on the evening of March 4th advised her husband to that effect, stating that she intended to go to the woman doctor in Seattle for an abortion. The husband was unwilling that she should do this, but left the matter to her own decision.

On the morning of March 5, 1945, Mrs. Fisher left home, in the family car, taking with her the four-year-old daughter and one hundred dollars in money, at the same time stating to her husband that she was going to Seattle and there have an abortion performed by the woman doctor referred to above. Later that morning, Mrs. Fisher called her husband by telephone and told him that she had not talked to that doctor, but that the doctor's nurse had referred her to one Dr. T., in Seattle.

It appears that on her way to Seattle, Mrs. Fisher stopped at the home of her mother-in-law, Mrs. Ethel Howard, who was a practical nurse with about twenty years' experience in that vocation. While at Mrs. Howard's home, Mrs. Fisher called the office of Dr. T. and conversed with someone in that office with reference to having an abortion performed upon her. This was the first intimation that Mrs. Howard had of Mrs. Fisher's pregnancy.

Shortly thereafter, Mrs. Fisher, accompanied by her four-year-old daughter and Mrs. Howard, drove to Seattle and called at Dr. T.'s office, arriving there at about noon. Dr. T. was unavailable, however, but his nurse handed to Mrs. Fisher the doctor's professional card, which appears as an exhibit in the case, on the back of which the nurse had written the appellant's name and his office address in the Joshua Green building in Seattle.

Leaving Dr. T.'s office, the party of three went to the office of the appellant. Upon their entrance they found the

waiting room filled with women. No nurse, however, was in attendance. Sometime after their arrival, appellant appeared in the waiting room and announced: "Five of you women that came in just now leave and those that were here yesterday remain." Mrs. Howard and the little girl thereupon left, but Mrs. Fisher remained.

About five o'clock that afternoon, Mrs. Fisher, who was then on her way home in her car, stopped at the home of her mother-in-law. She appeared to be suffering from shock, was perspiring profusely, and complained of a severe pain in her head. Mrs. Howard put her to bed and, in accordance with appellant's instructions, gave her a cup of black tea and placed a hot water bottle beneath her back. Mrs. Howard then observed that Mrs. Fisher was bandaged about her genital organs.

Mrs. Fisher remained in bed for about forty-five minutes, then arose and had dinner with Mr. and Mrs. Howard. At about 8:30 p. m. she left for home, stopping on the way at the service station to pick up her husband.

The next morning, March 6th, Mrs. Fisher informed her husband that she was preparing to return to the appellant's office for the purpose of having him remove "the blood clots." At this time, she appeared tired and worn. Taking her little daughter, she departed for Seattle and, on the way, stopped for a while at the home of Mrs. Howard. The party of three then drove on into the city, where they first had lunch and then proceeded to appellant's office. On their way to the office, Mrs. Fisher complained of severe pain in her arm and in the region of her heart; her face had taken on a color of deep red.

Upon their arrival at appellant's office, they again found it filled with women, but no nurse was present. Shortly thereafter appellant appeared in the waiting room and again announced that those who had come in for the first time should leave and that those who had been in the day before should remain. He then directed Mrs. Fisher to go into his inner office. Mrs. Howard, being alarmed over Mrs. Fisher's condition, said to the appellant: "I am very much concerned over her, she is ill." Appellant replied: "This is no

place for relations and children. Meet her downstairs in the lobby."

With the understanding that she would meet Mrs. Fisher in the lobby of the building in twenty minutes, Mrs. Howard left appellant's office and proceeded to do some shopping. Upon her return as agreed, she found a crowd gathered near the flower shop in the lobby of the building, and, upon approaching the group, identified Mrs. Fisher, who in the meantime had there collapsed and died.

An autopsy was later performed by the county coroner, an experienced surgeon and pathologist. He testified at the trial that Mrs. Fisher had been pregnant for approximately two months; that her pregnancy had been terminated through curettage of the womb less than forty-eight hours previously; that the cervix showed evidence of having been forced open and the interior of the womb scraped; and that on the right side of the womb there were two deep holes from which fragments of the uterine wall had been gouged out, and on the left side were other gouges. The coroner further testified that these gouges had caused blood clots to form which completely blocked one of the veins in that region of the deceased's body, and that portions of these clots, having broken loose, had passed up through the right side of the heart, plugging the pulmonary artery and causing Mrs. Fisher's death.

The coroner found no evidence whatever of any attempt on the part of Mrs. Fisher to cause abortion by self-administration of any drug or mechanical appliance, but only evidence of dilation and curettage. In conclusion, he testified that he saw no evidence indicating that curettage was necessary in order to preserve the woman's life, and that she appeared to have been in good physical condition. On cross-examination, he was interrogated by appellant's counsel as follows:

"Q. Now then, while we are on this subject of a pregnant uterus, I believe you stated that, in your opinion, this pregnancy was probably of about two months duration? A. Yes. Q. A woman would not be 'quick' with child when she was two months pregnant, would she? A. She would not."

After appellant's arrest, on March 7th, he voluntarily accompanied a captain of police and the chief investigator for the prosecuting attorney to appellant's office in the Joshua Green building, admitted them into the premises, showed them various medical equipment, and delivered to them certain instruments, consisting of a sponge-forceps and irrigating curettes, which were later introduced in evidence. Upon questioning by the officers, he stated that he kept no records of his patients and gave no receipts showing payment for services.

We now take up appellant's assignments of error and will consider them in the order presented by him.

His first assignment is directed to instruction No. 1, given by the trial court. In that instruction, the court set forth the two counts of the information as quoted above and concluded with the following statement:

"You are instructed that the words, 'who at said time was quick with child,' as they appear in Count II, are surplusage, and the State need not prove that allegation, and you will disregard it."

Appellant contends that giving this portion of the instruction, to which he had duly excepted, was error. It will be recalled that the surgeon who performed the autopsy testified that a woman "would not be quick with child when she was two months pregnant." That testimony has not been controverted in this case. It will further be observed that the paragraph of the instruction as above quoted had reference solely to the second count of the information, relating to manslaughter, not to count No. 1, relating to abortion.

Reference to Rem. Rev. Stat., § 2448, relating to abortion, discloses that it does not use either of the phrases "quick child" or "quick with child," but speaks simply of the *life* of the child whereof the woman is *pregnant*. Since that statute does not use either of those phrases in defining the crime of abortion, they would in all events be immaterial upon that charge and hence no proof thereof would be required.

On the other hand, Rem. Rev. Stat., § 2397, relating

to manslaughter by abortion, uses the word "any quick child of which she [the woman] is pregnant." It is apparent from a reading of that section, however, that the crime of manslaughter by abortion may be consummated in case the death of *either* the mother or of any quick child of which she is pregnant is produced, unless the act of the person accused is necessary to preserve the *mother's* life. In the case at bar, the appellant was not charged with causing the death of any quick child, but only the death of the woman, by acts which were not necessary to *preserve* either her life or that of the quick child with which she was then and there pregnant.

It may be that, where the intentional act of an accused person causes the death of a quick child of which a woman is pregnant, the accused may be found guilty of manslaughter under the last-mentioned statute, even though the woman herself survives, unless such act of the accused was a necessary attempt to preserve the life of the woman. That situation, however, is not involved here. It is only the *death of the woman* with which the appellant herein was charged and with which we are here concerned. The words "who at said time was quick with child,' as alleged in count No. 2 of the information, were therefore immaterial and did not require proof by the state. It may be noted here that this reference to "quick child" in the statute is an allusion to the common-law rule that the embryo came within the protection of the law only when it quickened. This has nothing to do with an abortionist's criminal liability for the death of the mother. 1 Clark and Marshall, Law of Crimes, 631, § 289.

If appellant's contention in this respect were sustained, it would present the anomalous situation of requiring the state to prove a fact which, under the evidence, did not exist, and the existence of which was not a necessary element of the offense charged in count No. 2. The trial court acted correctly in withdrawing that phase of the matter from consideration by the jury. *State v. Hartley,* 25 Wn. (2d) 211, 170 P. (2d) 333.

Appellant's second assignment of error is based upon the refusal of the trial court to give a series of three instructions requested by him. By these proposed instructions, the jury would have been judicially advised that, if the appellant, upon examination of Mrs. Fisher, found a situation to exist which led him to believe, and if he *in good faith* did believe, that she was in process of miscarriage, and that because of her condition it was reasonably necessary that she be curetted in order to save her life or to effect a cure of her, and if appellant *in good faith* did curette her, then appellant would not be guilty; one of these proposed instructions also charged the jury that it is not unlawful for a physician or surgeon to curette a woman for the purpose of removing from her body a fetus in which the physician *in good faith* believes life has become *extinct*.

Upon the post-trial argument with reference to the first two of these proposed instructions, the trial judge stated:

"Well, had the defendant [appellant] taken the stand and had there been any evidence to base it on, I certainly would have given it [the instruction on good faith]. But it seems to me that there was absolutely nothing on which to base an instruction on what he [appellant] found."

With reference to the third proposed instruction, the trial court stated: "But there is no evidence at all in the case that life [in the fetus] had become extinct."

It is appellant's contention, upon this assignment of error, that "the definition of the offense is grounded solely on lack of good faith—that is, a wrongful intent," and that it was incumbent upon the state to establish lack of good faith on the part of the appellant.

The governing statute on manslaughter by abortion, Rem. Rev. Stat., § 2397, quoted above, in defining the crime says nothing whatever about "good faith," or lack of such, on the part of the party committing the act. On the contrary, it specifically provides that any person who shall use or cause to be used any instrument, *with intent thereby to procure the miscarriage of a woman,* unless the same is necessary to preserve her life, in case the death of the woman is thereby produced, shall be guilty of manslaughter.

The "intent" referred to in the statute is the intent to procure the miscarriage of a woman by use of any instrument or other means, and if by such act the death of the woman is "produced," the person employing such instrument is guilty of manslaughter, unless such act is necessary to preserve the life of the woman.

In a number of other instructions, the trial court correctly instructed the jury on the question of intent, as contemplated by the terms of Rem. Rev. Stat., § 2397.

It was the burden of the state simply to prove, beyond a reasonable doubt, the elements constituting the offense as defined by the statute.

Whether "good faith," or lack of a "wrongful intent," is a good defense to a criminal charge is doubtful at best. That the tests of criminal liability are external, and independent of the degree of evil in the particular person's motives or intentions, is persuasively argued by Justice Holmes in Lecture II of The Common Law (1881). Where the elements of the crime charged are set forth in a statute, it is sometimes a difficult problem in statutory construction to ascertain whether lack of guilty knowledge is available as a defense. *United States v. Balint,* 258 U. S. 250, 66 L. Ed. 604, 42 S. Ct. 301; *Shevlin-Carpenter Co. v. Minnesota,* 218 U. S. 57, 54 L. Ed. 930, 30 S. Ct. 663; *Commonwealth v. Weiss,* 139 Pa. 247, 21 Atl. 10, 23 Am. St. 182, 11 L. R. A. 530.

A study of abortion statutes in the United States indicates that "good faith," unless that be meant to imply a reasonable belief that the operation is necessary to save the life of the mother, is not a recognized defense. Comment (1935), A Functional Study of Existing Abortion Laws, 35 Col. L. Rev. 87. Opinions of this court indicate that the "criminal intent" is the purpose "to cause a miscarriage," *State v. Russell,* 90 Wash. 474, 156 Pac. 565; "to commit an abortion," *State v. Gaul,* 88 Wash. 295, 152 Pac. 1029; "of committing an abortion," *State v. Pryor,* 74 Wash. 121, 132 Pac. 874, 46 L. R. A. (N. S.) 1028.

The appellant asserts that *State v. Powers,* 155 Wash. 63, 283 Pac. 439, is to the contrary. It is sufficient to note that there the case was submitted to the jury on the *theory* that

the state must establish lack of good faith, and the defendant was convicted. In its opinion, this court took pains to say: "Whether this [instruction] is a correct statement of the law we do not here determine."

■ We do not deem it necessary to decide that question here, for the reason that, in any event, appellant's "good faith" would be a matter of defense. As indicated above, appellant introduced no evidence whatever. Whether he acted in "good faith" would be largely a question of his state of mind, a subjective matter. For obvious reasons, the state could not well disprove an honest condition of his mind, and should not be required to assume that burden. In the case at bar, the state did offer evidence that it was not necessary to produce a miscarriage of Mrs. Fisher in order to preserve her life. If appellant had any evidence to prove that there was such necessity or that he in good faith believed that such was the situation, it was incumbent upon him to come forward with that evidence.

For the reasons above stated, we are satisfied that appellant's contention upon this point is not a correct exposition of the law, and that his assignment of error thereon is not well taken.

■ For similar reasons, we are satisfied that appellant was not entitled to the requested instruction that it is not unlawful for a physician or surgeon to curette a woman for the purpose of removing from her body a fetus in which the physician in good faith believes life has become extinct. While that instruction may have been a correct statement of the law, there was no evidence of appellant's good faith, nor was there any evidence that life in the fetus had become extinct. *State v. Patrick,* 179 Wash. 510, 38 P. (2d) 261.

■ Appellant's fourth assignment of error is directed to a certain remark made by the trial court during the progress of the case. Eighty pages of the statement of facts present the testimony given by the autopsy surgeon on direct and cross examination. The greater part of his testimony dealt with matters relating to various organs of the human body, particularly the female organs of reproduction. The answers given by the witness were largely in response to counsel's

technical questions employing a medical terminology, with which the ordinary person is wholly unfamiliar.

At the conclusion of the testimony given by the physician witness, the trial court remarked:

"*Both* sides having completed *their* organ recital, we will take a recess." (Italics ours.)

Appellant contends that this statement constituted a comment on the evidence, violative of Art. IV, § 16 of the state constitution.

Whatever else might be said concerning the remark made by the court, it did not, in our opinion, constitute a comment on the evidence. As stated in *State v. Brown,* 19 Wn. (2d) 195, 142 P. (2d) 257:

"The constitutional provision that the trial judge shall not comment upon the evidence means no more than that the trial judge is prohibited from action or words having the effect of conveying to the jury the trial judge's personal opinion as to the truth or falsity of any evidence."

Manifestly, the court did not, in this instance, express any "personal opinion as to the truth or falsity of any evidence." Furthermore, it is significant that counsel took no exception to the remark. It is even more significant that, in appellant's motion for new trial, the only ground assigned by him which could apply to this particular matter was "Error of law occurring at the trial and *excepted to* by the defendant [appellant]." (Italics ours.)

Then, again, as appears by the court's memorandum opinion disposing of appellant's motion for new trial, the only questions raised by the appellant related to (1) alleged misconduct of the prosecuting attorney, (2) the admission of certain surgical instruments in evidence, (3) the withdrawal by the court of certain instructions, and (4) the giving of a particular instruction. No reference to the court's remark, above quoted, and no criticism thereof, were made by counsel. Evidently counsel, who were thoroughly familiar with the circumstances under which the remark was made, did not consider it prejudicial to the appellant.

Having identified in their motion for new trial the error

of law complained of, as being such error as had been "excepted to," appellant thereby excluded all error of law, if any, to which no exception had been taken. This is further accentuated by the fact that appellant at no time, by argument or otherwise, called the matter to the court's attention, nor did he ever in any way invoke a ruling by the trial court as to whether the remark was of such a nature as to entitle him to a new trial. Under these circumstances, we do not believe that the question is properly here for consideration; but, if it were, we are of the opinion that the error, if such it can be termed, was not so prejudicial as to constitute reversible error.

█ The fifth assignment of error relates to the withdrawal by the court of certain instructions previously given by it. The trial court originally gave four instructions defining manslaughter and excusable homicide. After the state had made its opening argument, the jury was excused and appellant's counsel then moved that three of these instructions be withdrawn. The court granted the motion and, upon the return of the jury, made this statement:

"Ladies and gentlemen: It has been emphasized in all your jury service that you determine the facts and the Court determines the law.

"I don't know whether juries ever make mistakes in determining facts or not; but I am convinced that the Court does at times commit error in his declaration of the law. And in the type of case that is presented, the Court is at this time convinced that instructions eleven, twelve and thirteen as given to you should not have been given. They were read to you and I am not going to re-read them. They will be marked 'Withdrawn' in the copy you take to the jury room, so that you will know specifically what the Court has in mind when he says that instructions eleven, twelve and thirteen are withdrawn."

After all the argument had been concluded, the court made the following statement to the jury:

"Ladies and Gentlemen: You may now retire to consider your verdict in this case.

"The Court has determined to withdraw one other instruction, and that is instruction 10. Ten, eleven, twelve and thirteen are all withdrawn for the same reason, that while

they are stock instructions ordinarily given in manslaughter cases, they do not have any applicability to a case of this particular character where the charge is based upon a specific statute; and they are withdrawn for the reason that they are not applicable to this case. You may now retire."

Each of the four instructions was marked: "Withdrawn from Consideration of Jury. Matthew W. Hill, Judge," but were nevertheless sent to the jury with the other instructions in the case. Appellant took exception, and now assigns error, upon the court's action in permitting these instructions, so marked, to go to the jury.

The procedure adopted by the court was, in our opinion, proper. In *State v. Cox*, 197 Wash. 67, 84 P. (2d) 357, wherein the defendants were charged with the crime of abortion, a similar situation was presented. After giving its instructions to the jury, the court concluded that one of them was not proper and told the jury not to consider it. We held that the method adopted by the court was proper, and that it could not be asserted to constitute reversible error. In the case at bar, the court itself took the added precaution to mark the instructions as above described so that there could be no doubt or confusion in the mind of the jury as to what instructions had been specifically withdrawn from consideration.

The case of *Bouton-Perkins Lbr. Co. v. Huston*, 81 Wash. 678, 143 Pac. 146, relied upon by the appellant, is wholly inapplicable to the situation presented here.

In his sixth assignment, appellant contends that the court erred in permitting Mr. Fisher, the husband, over objection, to testify concerning statements made by the deceased to him with reference to her decision to terminate her pregnancy and with reference to her intention to visit the various doctors above mentioned for the purpose of having an abortion performed, and having "the blood clots" removed by the appellant. It is contended that all of this testimony constituted hearsay and was therefore inadmissible.

In admitting the testimony, the trial court specifically instructed the jury that it was not to be considered as evi-

dence of the fact that appellant performed any of the acts charged against him, but solely for the purpose of showing the nature, character, and object of the act that Mrs. Fisher had decided to have done; that it was not evidence that appellant committed an abortion, but rather to prove the intent and explain the actions of the deceased. This explanation was subsequently reiterated by the court to the jury.

The rule is settled, both in Washington and elsewhere, that in homicide cases, at least, spontaneous declarations by the deceased indicating his state of mind are admissible as evidence of his design or plan to do a specific·act, where the accomplishment of such act later becomes an issue relevant to the question of guilt. In *State v. Power,* 24 Wash. 34, 63 Pac. 1112, 63 L. R. A. 902 (death following abortion), *State v. Mayer,* 154 Wash. 667, 283 Pac. 195 (murder), and *State v. Payne,* 25 Wn. (2d) 407, 171 P. (2d) 227, 175 P. (2d) 494 (death following abortion), testimony of this character was treated as part of the *res gestae* and admitted as an exception to the hearsay rule. The term *res gestae* has been used in such a variety of settings that it ceases to have meaning for professional purposes.

"It is impossible to define accurately the declarations which should be treated as parts of the *res gestae." Burns v. State,* 49 Ala. 370.

Edmund M. Morgan, in his article, *Res Gestae,* (1937) 12 Wash. L. Rev. 91, demonstrates why this is so. But whatever the language employed to justify the rule, it is commonly accepted.

*State v. Phillips,* 68 N. D. 113, 277 N. W. 609, involving a prosecution for death arising from abortion, considered this problem. It reviewed a number of authorities, including *State v. Power, supra,* and concluded:

"As will be noted in the foregoing decisions, the admissibility of the questioned evidence is based upon the plan or design of the deceased to have an abortion performed, which plan or design is relevant to the issues of the case, because its consummation results in the opportunity of the defendant to commit the crime with which he is charged. Thus, both the declarations of intention on the part of the

deceased and her acts performed in carrying out her intention, as thus declared, are relevant, and testimony concerning them is admissible if properly circumscribed by the instructions of the trial court."

In a murder case, *State v. Journey*, 115 Conn. 344, 161 Atl. 515, the scope of the rule is well stated:

"The widow of Buda was asked by the State's Attorney upon her direct examination what her husband had said when he left the house that morning, and, over the objection of the accused, was permitted to testify that he said he was going to work for Journey. The existence of a plan or intention to do a thing is relevant to show that the act was probably done as planned. The plan or intention, being a condition of mind, may be evidenced, under an exception to the hearsay rule, by the person's own statement as to its existence. A declaration indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed. It is admissible, not as a part of the *res gestae,* but as a fact relevant to a fact in issue. [Citing authorities.] A fact in issue in the case was whether Buda was in the company of the accused on the morning in question. His plan or intention to go to his house was a fact relevant to a fact in issue, and his own declaration that such was his intention was admissible in proof of such relevant fact."

The interesting opinion of Mr. Justice Harris, in *State v. Farnam,* 82 Ore. 211, 161 Pac. 417, Ann. Cas. 1918A, 318, which was a murder case involving attempted abortion, reviews a great number of cases touching this question, and states this conclusion:

"If the doing of an act is a material question, then the existence of a design or plan to do that specific act is relevant to show that the act was probably done (1 Wigmore, Ev., § 102); and, considering the plan or design as a condition of the mind, a person's own statements of a present existing state of mind, when made in a natural manner and under circumstances dispelling suspicion and containing no suggestion or sinister motives, only reflect the mental state, and therefore are competent to prove the condition of the mind, or, in other words, the plan or design."

Students of the law of evidence have examined the historical and logical bases for this rule and find it a desirable

exception to the rule against hearsay. Hinton, States of Mind and the Hearsay Rule (1933), 1 Chi. L. Rev. 394; 6 Wigmore, Evidence (3d ed.), § 1725; Model Code of Evidence, Rule 513, and comment thereon, pp. 265, 267.

The appellant has cited no authority in support of his assignment of error, and we conclude that it is ill-founded.

■ Under this same assignment, appellant contends that the court erred in admitting in evidence, over his objection, the professional card which Dr. T.'s nurse handed to Mrs. Fisher and on the back of which was written appellant's name. It is contended that the card constituted written hearsay evidence.

As previously shown, the card was delivered to Mrs. Fisher in the presence of Mrs. Howard immediately prior to the visit of the two women at the appellant's office. In these circumstances, the card served to corroborate Mrs. Howard's testimony. The writing on the card asserted nothing. It appears simply to be what Professor Wigmore calls an "utterance serving to identify time, place or person," and is not hearsay evidence. 6 Wigmore, Evidence (3d ed.), § 1791.

■ Appellant's seventh assignment of error is based upon certain remarks made by the prosecuting attorney in his opening statement to the jury. In his outline of the evidence that would be offered by the state, the prosecutor described Mrs. Fisher's prior efforts to engage the services of the woman doctor and Dr. T. to perform the abortion upon her, and referred to those two doctors as "well-known abortionists."

Appellant contends that these statements were made for the purpose of compelling him to take the witness stand and also to call the two doctors as witnesses, and that the remarks constituted prejudicial error requiring a new trial.

It is to be noted, however, that, in the very beginning of his opening statement, the prosecutor told the jury that any statement made by him was not to be regarded as evidence; that the only evidence which could be considered was such as would come from witnesses duly sworn; and that the jury should disregard any statement made by him which

was not supported by the evidence. In addition to that, immediately upon objection of the appellant to the remarks of the prosecuting attorney, the trial court specifically admonished the jury that it was to disregard any statements that were not supported by the evidence.

In ruling upon the motion for new trial, the court stated that the remarks of the prosecutor should not have been made, since no evidence was or could have been introduced to support them. However, the court was of the belief that the remarks were not so prejudicial as to warrant a new trial. As the court at the time aptly pointed out, those remarks were not made concerning the appellant and did not leave such an imputation against appellant as would compel him to testify (which he did not do), or else rest under the imputation.

In judging of what constitutes misconduct, each case involving such question must stand by itself and must be considered in the light of all its particular facts and circumstances, to the end that verdicts properly arrived at shall not be disturbed and that those verdicts which have been induced by prejudice or by something beyond the issues shall not stand. *State v. Navone,* 186 Wash. 532, 58 P. (2d) 1208.

Under all the circumstances connected with this particular matter, we agree with the trial court that the statements made by the prosecutor did not result in prejudice requiring a new trial.

■ The eighth assignment is likewise predicated upon alleged misconduct of the prosecuting attorney. At the conclusion of the evidence, the prosecutor, in his argument to the jury, stated:

"The fact that there is evidence enough to justify you to return such a verdict [of guilty] is apparent from the fact that the Court lets this case go to you. But the Court tells you that in your own mind you must be satisfied as to certain things in order to return a verdict of 'guilty'. We accept that burden as this case goes to you, to prove to you beyond a reasonable doubt those requirements in this case."

Appellant did not except to that statement at the time it was made, but at the conclusion of the prosecutor's argu-

ment, and in the absence of the jury, moved for an order of mistrial upon that ground. The court denied the motion, but, on the return of the jury, took utmost pains to instruct it as follows:

"I want also specifically to charge you that the fact that this case is presented to you for your determination is not to be regarded by you as any indication that the Court believes that the defendant is guilty or that if the Court were in your position that he would render such a verdict.

"The Court is specifically precluded from commenting upon the evidence or expressing an opinion; and the Court is fearful that some of you might, from the statement made by Mr. Shorett in his opening argument to the effect that the fact that the Court has permitted this case to go to you is, in itself, some indication that the defendant is guilty. Such is not the case. Otherwise, there would be in every case that went to the jury a feeling that the plaintiff had established a case; or, in the case of a criminal prosecution, that the State had established its case.

"The Court again renews the charge heretofore made that you are the sole judges of the facts; that the determination of the guilt or of the innocence of the defendant rests entirely with you, and you are to draw no inference of guilt from the fact that the case is submitted to you for your consideration."

It further appears that this charge by the court was reduced to writing, signed by the court, attached to the instructions previously given, and went as a part of the court's instructions to the jury.

We think the court did exactly what it should have done in this instance, and that its action effectively cured any error that would have otherwise existed.

 Under his ninth assignment of error, appellant complains that the curettes and other medical instruments found in his office by the detective and the investigator were improperly admitted in evidence because they had been seized by the officers without a warrant.

So far as the record discloses, appellant made no motion, prior to the trial, that such evidence be suppressed. Upon the trial, it did not appear from any evidence elicited from the state's witnesses, either upon direct or upon proper cross examination, nor was it otherwise conceded by the state,

that these articles had been unlawfully seized. On the contrary, it appeared from the testimony given by the officers that appellant had voluntarily accompanied them to his office, had admitted them to the premises, and, after conducting them into his private office, had turned over to them the instruments subsequently admitted in evidence. These facts bring the case squarely within the rules laid down in *State v. Dersiy*, 121 Wash. 455, 209 Pac. 837, 215 Pac. 34, and *State v. Gunkel*, 188 Wash. 528, 63 P. (2d) 376. Appellant's assignment is therefore without merit.

 Appellant's tenth assignment is that the court erred in not directing a verdict of acquittal. This assignment needs no extended discussion. In our opinion, the evidence introduced by the state, against which appellant produced no counter evidence, was ample to support the verdict rendered by the jury.

The eleventh and twelfth assignments of error challenge the correctness of the court's denials of the motion for new trial and the motion in arrest of judgment. These assignments present nothing beyond the other assignments and call for no further consideration.

The judgment is affirmed.

SIMPSON, MALLERY, and SCHWELLENBACH, JJ., concur.

CONNELLY, J. (dissenting)—I dissent for the reason that I believe that the testimony of the husband, admitted in this case, purporting to repeat statements of his deceased wife, invades the hearsay rule and goes far beyond the original rule announced in *State v. Power*, 24 Wash. 34, 63 Pac. 1112.

I further feel that the trial judge's reference to the direct and cross examination of the autopsy surgeon as "an organ recital," made in the presence of the jury during the trial, constituted a studied effort on his part to convince the jury that that witness's testimony should be treated facetiously and accorded little or no weight and was, therefore, *a clear comment on the evidence.*

February 3, 1947. Petition for rehearing denied.