STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
CHARLES L. THORNTON, DEFENDANT-APPELLANT.

Argued September 11, 1962—Decided October 22, 1962.

381

*Mr. Brendan T. Byrne,* County Prosecutor of Essex County, argued the cause for plaintiff-respondent (*Mr. C. William Caruso,* Assistant County Prosecutor, of counsel and on the brief).

*Mr. William D. Hardin,* Assigned Counsel, argued the cause for defendant-appellant (*Mr. George A. Padgett,* on the brief).

The opinion of the court was delivered by

FRANCIS, J.  Defendant shot and killed his wife Geraldine Thornton on February 8, 1960.  Subsequently he was indicted for murder and after trial was convicted of murder in the second degree.  On November 30, 1960 he was sentenced to State Prison for 25 to 30 years.  He has appealed directly to this court under *R. R.* 1:2–1(c), seeking reversal of the conviction because of alleged prejudicial errors in the admission and rejection of certain evidence, in the trial court's charge on self-defense, and in certain portions of the prosecutor's summation.

Defendant and his wife were married on February 9, 1952. It was the second venture for both, their first marriages having ended in divorce.  For a few years their life together was happy.  After that, incompatibility set in and their relationship became a stormy one marked by a series of separations and reconciliations.  It is evident from the proof that they were nervous, tense and temperamentally volatile persons.  Evidence was offered also to show that each was suspicious and jealous of the other.  Thornton had been under regular medical treatment for a stomach ulcer from 1957 to the date of this homicide.  In fact, Mrs. Thornton also was under the care of the same physician for a nervous ailment.  He became aware of their domestic discord and recommended that they consult a psychiatrist.

Proof was adduced by the State that on occasion during the separations defendant had threatened the life of his wife. The defense offered evidence of similar threats by the wife

against the defendant. It appears that on one occasion in November 1959 Mrs. Thornton filed a complaint in the Municipal Court of Newark against her husband charging him with assault and battery. Trial of the case resulted in a not guilty determination.

On November 4, 1959 while they were living in a third floor apartment at 351 Hunterdon Street, Newark, Mrs. Thornton again left defendant and they had not resumed cohabitation at the time of the fatal shooting, February 8, 1960. In December she sued for divorce on the ground of extreme cruelty. He filed an answer denying the charge. Between November 4, 1959 and February 8, 1960, the strife continued. According to Thornton, on one occasion his wife broke into his apartment, allegedly looking for a woman, and, not finding one, smashed articles of furniture and struck him in the head with a figurine. On another occasion (he asserted) she tried to move all the furniture out of the apartment in his absence. At still another time, according to his testimony, she broke all the windows in his automobile.

There is little doubt that the parties had face-to-face and telephone conversations during this last separation period. The purport of these discussions is in conflict. Thornton's version is that his wife wanted to abandon her divorce proceeding and return to him. He testified he told her he had had enough and that she should obtain the divorce. The State offered proof indicating that Thornton endeavored to have his wife's family intercede to "straighten out" their "affairs"; that he had accused his wife of "going with" her step-father and of having a boy friend, one John Lattimore, a Newark police officer. Additional evidence was produced to show that about a week before the shooting defendant said he was going to "kill" his wife or "shoot her." Defendant countered with evidence of threats of harm against him made by his wife and her alleged boy friend.

Thornton had been in the employ of Weston Electrical Instrument Corporation for some time before the homicide. His hours of work were 4:06 P. M. to 12:42 A. M. On

Monday, February 8, 1960 he was not feeling well and decided to visit the doctor instead of going to work. His stomach and nerves had been bothering him and the treatments received on the previous Thursday and Friday had not remedied the condition.

Around noon on February 8, according to Thornton's testimony, he received a telephone call from his wife concerning her continued possession of a key to the front door of the Hunterdon Street building where he still lived. (In his written statement to the police he said he made the call.) In the course of the conversation he mentioned her male friend Lattimore and said that Lattimore had been following him. She gave him Lattimore's phone number, and Thornton alleged that he called Lattimore who cursed at him and said he would "come up" in a few minutes and straighten things out. Thornton claimed he then telephoned the attorney who was representing him in the divorce action and was advised to report the matter to the police. He followed the advice but, according to his testimony, the police officers said nothing could be done. The occurrence of these various conversations is disputed by the State. Lattimore denied ever talking to Thornton on February 8, and there is no police record of the alleged visit by Thornton. The State introduced proof through a friend of the decedent indicating that Thornton had telephoned his wife on this day, as the result of which the wife manifested concern about his sickness and expressed an intention of visiting him. The admissibility of that testimony, which will be discussed more fully later in this opinion, is made a principal ground of defendant's appeal.

Shortly after 7:00 p. m. on February 8, two Newark police officers came to the Hunterdon Street address in response to a telephone report that a shooting had taken place there. The front door of the building was locked and on looking through the glass partition they saw a body on the hallway floor. As they were about to break in, the defendant came down the stairs and let them in. He told them that the person on the floor was his wife and that he had shot her by mistake. He

"mistook her for someone else"; he had mistaken her for "James Lattimore."

In a short time two detectives arrived and questioned Thornton in his third floor apartment. He told them, and later gave a written statement to the same effect, that he had heard the front doorbell ring and thinking that it was his wife's friend Lattimore, who allegedly had threatened him earlier in the day, he took an automatic pistol from a dresser drawer and went downstairs. As he opened the front door in the dark hallway, a figure started to come in and he fired at it, the number of times he could not say. The person "sagged" against him and he realized it was a woman. He put the light on and saw that it was his wife. After trying to get a doctor he asked the telephone operator to summon the police. Then, placing the pistol on a couch in his apartment, he returned to his wife.

The police found the pistol on the couch. On the floor of the hallway near the decedent they discovered an ejected shell and a spent lead bullet. Autopsy showed three bullet wounds in the victim's body. They were "contact" wounds, that is, the bullets were fired at a distance of not more than six inches.

At the trial, the prosecution contended Thornton knew it was his wife who rang the doorbell, and that he had lured here there with the intent of shooting her.

The defense was a complete and radical departure from, and repudiation of, the oral and written version of the shooting. Defendant's explanation of the change was that he did not "want to involve [his] wife in too much" by giving the police the true facts.

On the witness stand Thornton said he had discovered that Lattimore had been following him. He learned also that Lattimore had been seeing his wife. So, for purposes of protection, he began to carry his automatic pistol in the car. On February 8 at about 6:30 P. M., he drove to his doctor's office to obtain treatment for his stomach condition. The pistol was under the driver's seat of the car where he had

placed it a few hours earlier. After parking some distance away and entering the office, he learned that the doctor had not yet arrived. Ten minutes or so later he saw a parking place nearer the office and decided to move his car there. He walked to the vehicle and found his wife sitting on the passenger side of the front seat. He got in alongside of her and a conversation ensued in which she expressed a desire to return to him. On his refusal, and statement that he wanted the divorce to go through, she began to cry and asserted that he preferred someone else. Then (according to his testimony), she said if she could not have him no one else would have him, and took a gun out of her pocketbook. He grabbed her wrist and as they struggled, he reached under the seat for his pistol saying, "I have a gun, too," to which she replied, "You had better use it because I'm going to kill you." She shot first and he fired at her a number of times. Realizing he had shot her, he drove to the doctor's office for aid but the doctor had not arrived. Then he drove his wife at her request to his apartment on Hunterdon Street. There, he carried her into the hallway and laid her down on the floor. She asked for her "bag and things" and he ran back to the car where he "grabbed everything," her bag, shoes and some shells which were on the front seat. (He made no mention of the spent bullet which the police later found in the hallway.) Although he looked for her gun he did not see it. The articles were brought inside and, except for the shells which he put in his pocket, were placed on the floor near his wife. On cross-examination later in the trial, he said he could remember only one shell, and that one he put near the steps in the hallway. Whether the alleged return to the car for these things occurred before or after the police were summoned is not clear from the record.

Trial of the case consumed eight days. The record is filled with a multitude of conflicting statements of various witnesses for the State and the defense. For purposes of this appeal it is not necessary to set forth the factual situation in any greater detail than we have done. The basic theories

presented by the contending parties at the trial level were plain and obviously in irreconcilable conflict. The State claimed that the defendant, after influencing his wife to come to his apartment on the fatal day, shot her to death pursuant to a preconceived design, and therefore was guilty of a premeditated, deliberate and willful killing, *i.e.*, murder in the first degree. The defense asserted that the fatal event took place in Thornton's automobile on the public street and that he shot his wife in self-defense. The jury resolved the issue by finding the defendant guilty of murder in the second degree, which verdict he now seeks to set aside.

## I.

At the trial the State produced one Sullie Williams, a cousin of Mrs. Thornton who had known her all her life. He testified that around 4:00 P. M. on February 8, 1960 he telephoned her mother about some clothes he was supposed to pick up, and Mrs. Thornton answered the phone. At this point the prosecutor indicated he wished to prove that in the course of the conversation decedent told the witness of her intention to visit her husband. After defense objection and consultation of authorities, the trial court said he would overrule the objection but would limit the testimony to the portion of the conversation dealing with the decedent's intention to make the visit. Thereupon, the questioning proceeded:

"Q. Now you had a conversation with Geraldine Thornton. Is that correct? A. It is.

Q. What did Geraldine Thornton tell you on the phone? A. She asked me had I seen her husband.

Q. Don't tell us what you said. She asked you if you had seen her husband? A. Yes, and she said he had called her all day, had worried her about to death."

At this juncture the court cautioned the prosecutor as to the limit that had been imposed on the inquiry. Defense counsel apparently was not concerned about the answer. He did not object to it nor move to strike it from the record. The examination continued:

"Q. Did you have a conversation with Mrs. Thornton in which she indicated to you where she was going?

THE COURT: Answer yes or no. A. Yes.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. What did she say about where she was going? A. She didn't tell me where she was going. She said she thought that as he was sick she should go and see about it.

Q. At what time was this? A. That was about 4 o'clock."

Defendant argues that the deceased's statements to the witness that her husband had called her all day and had worried her to death, and that since she thought he was sick she should go and see about it, were clearly hearsay and so manifestly prejudicial to his defense as to require reversal of the conviction. He advances a further specific objection to the latter portion of the testimony, namely, that Mrs. Thornton did not express an actual intention of visiting defendant. That criticism may be disposed of summarily. No such precision in language is required. A realistic inference is that she intended to visit her husband because she thought he was sick. And the fact of her later presence there provides adequate support for the inference.

We are satisfied that the challenged evidence was admissible as an exception to the hearsay rule. When a person's engagement in a course of conduct or an act (here, the decedent's visit to defendant's apartment) is relevant to the resolution of a controversy over an occurrence which becomes the subject of subsequent litigation (here, the homicide), declarations of the person of his present intention or plan to do so, are competent, substantive, and original evidence of his probable engagement in the course of conduct or act. That is not a strange or extraordinary doctrine. It represents a rule of evidence which is firmly established by the overwhelming weight of judicial opinion. *Hunter v. State*, 40 *N. J. L.* 495 (*E. & A.* 1878); *Mutual Life Ins. Co. c. Hillmon*, 145 *U. S.* 285, 12 *S. Ct.* 909, 36 *L. Ed.* 707 (1892). See also, *Robertson v. Hackensack Trust Co.*, 1 *N. J.* 304 (1949); *State v. Long*, 108 *N. J. L.* 98 (*E. & A.* 1931); *In re Spiegelglass*, 48 *N. J. Super.* 265 (*App. Div.* 1958);

*Schloss v. Trounstine,* 135 *N. J. L.* 11 (*Sup. Ct.* 1946) ; *State v. Kane,* 77 *N. J. L.* 244 (*Sup. Ct.* 1909) ; 6 *Wigmore, Evidence* (*3d ed.* 1940), §§ 1715, 1725; Annotation, 113 *A. L. R.* 268 (1938). It may be regarded as long since settled in this State that a person's own statements of a present existing state of mind, when made in a natural manner and under circumstances dispelling suspicion and involving no suggestion of sinister or improper motives, reflect his mental state and are competent to prove the condition of his mind—that is, his plan or design. *Hunter v. State; Schloss v. Trounstine, supra.* Those expressions are the natural reflexes of what it might be impossible to show by other testimony. Accordingly, admissibility is particularly compelling when the declarant has since died. As Justice Heher indicated in *Schoss,* when the declarant is dead such evidence is not only the best but generally the only evidence of what was in his mind at the time. 135 *N. J. L.,* at *page* 14.

So when Mrs. Thornton, in effect, told her cousin, a few hours before she was shot, of her intention to visit her husband, the statement was a perfectly natural incident of the conversation. It related to the then existing state of her mind; it was made in the ordinary course of a conversation as the usual type of information she might communicate to her cousin; and the circumstances were such as to exclude suspicion of an intention to make evidence to be used at a trial. See *Hunter v. State,* 40 *N. J. L.,* at *page* 538. The additional statements which accompanied the expression of purpose to visit Thornton and the reasons in the very recent past which motivated the intention do not justify limitation of the testimony to the narrow statement of the plan to make the visit; nor because of their contextual association do they so debilitate the entire conversation as to render all of the declarations inadmissible. In the light of the factual background of the case and the circumstances under which the conversation was had, the accompanying utterances gave a more definite significance to her indefinite conduct. They

added a missing part. The additional words were the verbal part of the whole act, filling out and giving significance to her intention and her ensuing conduct. They mirrored her mental state and under all the circumstances not only evidenced an intention to call on her husband but also a sympathetic and peaceful motivation for doing so. *Cf. Merritt v. State*, 39 *Tex. Cr. Rep.* 70, 45 *S. W.* 21 (*Crim. App.* 1898).

The Federal Court of Appeals for the Second Circuit had occasion recently to deal with a similar situation. In *United States v. Annunziato*, 2 *Cir.*, 293 *F.* 2d 373 (1961), the defendant, a union business agent, was convicted of receiving money from an employer in violation of the Labor Management Relations Act. At the trial evidence was introduced that the president of the employer company (who had since died) had asked the general superintendent to take a sum of money with him to Bridgeport in order to keep a commitment he (the president) had made to the union agent, Annunziato. A critical question was whether the president's declaration of present intention to send money to defendant became inadmissible because it was accompanied with "an altogether natural explanation of the reason in the very recent past that had prompted it."

In holding the full statement admissible, the court said among other things:

"True, inclusion of a past event motivating the plan adds the hazards of defective perception and memory to that of prevarication; but this does not demand exclusion or even excision, at least when, as here, the event is recent, is within the personal knowledge of the declarant and is so integrally included in the declaration of design as to make it unlikely in the last degree that the latter would be true and the former false." At *page* 378.

Many cases are to be found where a statement of the reason which accompanied the expression of intention to take a described trip or to do a certain act have been admitted. The reasons qualify for probative value so long as they appear to be integrally and naturally related to the declared purpose, to have a natural association with it, and to have been uttered

as a normal, unsuspicious incident of it. For example, in *Hunter*, receipt in evidence of a letter written by the decedent to his wife on the afternoon preceding the murder was approved. It informed her that he was "going over to Camden again with Mr. Hunter, on business connected with the Davis matter." In *Price v. State*, 72 *Ga.* 441 (*Sup. Ct.* 1884), an analogous case, a husband and wife separated, the wife returning to her father's home. Some time later the husband was shot to death by the father. On the day of the shooting the husband told two friends that he had received a letter from his wife with good news in it, that is, indicating a desire for reconciliation, and that he was going to her father's house to take her home. The statements were received and their admission was sustained on appeal after conviction.

Similar rulings have been made in abortion murder cases involving a declaration by decedent that she intended to go to the defendant for an abortion. *State v. Hart*, 26 *Wash.* 2d 776, 175 *P.* 2d 944 (*Sup. Ct.* 1946); *State v. Phillips*, 68 *N. D.* 113, 277 *N. W.* 609 (*Sup. Ct.* 1938). Again, in an insurance policy suit the issue was whether decedent had been struck by a train accidentally or pursuant to his intention to commit suicide. Evidence was received that on leaving a tavern where he had been drinking he told his friends he was going home to kiss his wife and children and go to bed. *Greenacre v. Filby*, 276 *Ill.* 294, 114 *N. E.* 536, *L. R. A.* 1918 *A*, 234 (*Sup. Ct.* 1916). In *Sullivan v. State*, 171 *Ark.* 768, 286 *S. W.* 939 (*Sup. Ct.* 1926), a witness was permitted to say that the deceased told him on the morning of the killing that he was going to see the defendant about payment of a bill for lumber.

The Supreme Court of Colorado in *Alexander Film Company v. Industrial Commission*, 136 *Colo.* 486, 319 *P.* 2d 1074 (*Sup. Ct.* 1957), a workmen's compensation proceeding, sanctioned admissibility of a statement made shortly after 4:00 P. M. on location by the director of a motion picture to a cameraman that he was returning to his motel to revise the next day's script. The director was killed by an automobile

while crossing the street to the motel. The declaration was received to prove an accident arising out of, and in the course of, employment. To the same effect are *Great American Indemnity Company v. McCaskill*, 240 *F.* 2d 80 (5 *Cir.* 1957); *Lewis v. Lowe and Campbell Athletic Goods Co.*, 247 *S. W.* 2d 800 (*Mo. Sup. Ct.* 1952). See also, *White v. United States*, 216 *F.* 2d 1 (5 *Cir.* 1954); *Thornton v. State*, 253 *Ala.* 444, 45 *So.* 2d 298 (*Sup. Ct.* 1950); *State v. Hart*, 26 *Wash.* 2d 776, 175 *P.* 2d 944 (*Sup. Ct.* 1946); *Malone v. New York Life Ins. Co.*, 148 *Kan.* 555, 83 *P.* 2d 639 (*Sup. Ct.* 1938); *People v. Atwood*, 188 *Mich.* 36, 154 *N. W.* 112 (*Sup. Ct.* 1915); *State v. Hayward*, 62 *Minn.* 474, 65 *N. W.* 63 (*Sup. Ct.* 1895); *American Surety Co. v. Minard*, 118 *Ind. App.* 310, 77 *N. E.* 2d 762 (*App. Div.* 1948); footnotes, 6 *Wigmore, supra*, § 1725, *pp.* 81–85.

In the ordinary relations among people what is done and what is said are often so related that neither can be separated from the other without leaving the remainder fragmentary and distorted. There may be fraud and falsehood as to both, but where the act and declarations appear to be natural constituents, there is no ground of objection to the one that does not apply equally to the other. To reject the verbal fact would frequently have the same effect as to excise the controlling clause from a sentence or the controlling sentence from its context. *Travelers' Ins. Co. of Chicago v. Mosley*, 75 *U. S.* 397, 19 *L. Ed.* 437 (1869).

In the factual framework of this case there was such a natural and spontaneous integration of statements of intention and reasons which gestated the intention, that receipt of the whole of the challenged statements of decedent was thoroughly warranted. Of course, problems of credibility and evidentiary value were for the jury to determine. Defendant criticizes the trial court's action in this regard largely because the declarations provided support for the prosecutor's thesis that he had enticed his wife to the apartment pursuant to a plan to kill her. There is no doubt that, along with other evidence, they were used *arguendo,* and we

think legitimately so, for that purpose. In any event the verdict in the case empties the argument of any significant force. The State's purpose in presenting the "luring" theory was part of the effort to establish the defendant's guilt of first degree murder, *i. e.*, a premeditated, deliberate and willful killing. But the jury, after hearing all of the evidence, decided that such a planned homicide had not been committed; that defendant's criminal conduct was limited to second degree murder.

## II.

As has been set forth above, the State proved that in December 1959 Mrs. Thornton sued the defendant for divorce. It was stipulated that the complaint in the action charged extreme cruelty, that Thornton filed an answer denying the charge, and that the case was never tried.

This proceeding was introduced as an incident of the State's position that Thornton was opposed to the marital separation, wanted his wife to return to him, and finally decided to kill her because she would not accede to his wish.

In defense Thornton testified at length that he was not opposed to the divorce. He said the matter was discussed with his wife and he told her on at least three occasions, the last being on the day of the homicide, that she should go ahead with the action and obtain the decree. He persisted in this attitude (he said) in spite of her expressed desire to terminate the proceeding and return to him.

The attorney who represented defendant in the divorce case was called as a defense witness. After showing that Thornton had retained him in that matter, the questioning continued:

"Q. And did you discuss the divorce proceedings with him? A. Yes, sir.
Q. And what was his attitude concerning the same?
MR. CLINTON [Assistant Prosecutor]: I am going to object.
THE COURT: Sustain the objection.
Q. What did he tell you he wanted to do in relation to this?

MR. CLINTON: I object.
THE COURT: Sustain the objection. If you are going to do that I certainly am going to let this entire divorce petition go into evidence. You are opening the door."

The inquiry ended at this point. At no time was there any statement as to the purpose of the interrogation, or the nature of the evidence being sought, nor any proffer of proof so as to acquaint the court with its relevancy and to make an adequate record for appellate review.

On this appeal assigned counsel suggest that even though no such supporting record was made or even though trial counsel did not have or may not have had the purpose in mind, the questions were proper for the purpose of revealing the defendant's state of mind with respect to contesting his wife's suit for divorce. It is said also that the attorney's answers would have indicated Thornton did not wish to oppose her application. The claim is that such evidence which came into being prior to the homicide, would demonstrate defendant's state of mind at the time of the divorce action, a relevant fact in view of the theory of the State's case against him. And conceding that the evidence is hearsay, defendant says it should have been received because it meets all the conditions precedent which sufficed to render competent his wife's declarations relating to her intention to visit him on the day of the shooting.

■ We agree that if the specific purpose of the questions was to draw from the witness declarations or instructions of the defendant not to contest the divorce suit, under the test of competency discussed at length above, they would have qualified for admissibility. Since defendant's intention not to contest the divorce did come into the case through his own testimony, and having in mind the entire framework of the case including the second degree murder verdict, we cannot conclude that rejection of the hearsay statements constituted such manifestly prejudicial error as to warrant a reversal. We do not mean to indicate that under circumstances like those present here, a refusal to permit questions properly

framed to evoke declarations showing a state of mind not to oppose the divorce could be justified on the theory that the evidence would be cumulative. On the whole record of this fairly long trial wherein the evidence amply supported the verdict and in which the verdict might well have been a more extreme one, we do not find that the defendant suffered prejudicial error requiring a reversal. In short, we can say with fair assurance after studying all that happened, including the erroneous action, that the conviction was not swayed by the error nor were defendant's rights affected to his detriment. See *Kotteakos v. United States*, 328 *U. S.* 750, 765, 66 *S. Ct.* 1239; 90 *L. Ed.* 1557, 1566–1567 (1946).

## III.

■ On this appeal defendant charges that the prosecutor committed a number of improprieties in his summation to the jury. No objection was made at the trial and the matter is presented on the ground that the remarks constituted plain error—that is, error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense. *State v. Johnson*, 31 *N. J.* 489, 510 (1960); *State v. Corby*, 28 *N. J.* 106, 108 (1958). Even though we cannot find that the improprieties in the prosecutor's summation considered in the light of its entire context constituted such egregious error as to require reversal of the conviction, they do require comment.

■ The first criticism asserted by defendant relates to the following statement by the prosecutor:

"Now, there is a difference, however, that I think should be brought out as to the function of the defense attorney and also as opposed to the function of the prosecutor. *The defense is concerned with one primary element and that is seeing that the defendant is found not guilty. That is the sole area in which the defense attorney operates.*" (Emphasis added)

The italicized portion of the remarks is improper and represents a misstatement of the defense attorney's position in the trial of a criminal case. Pursuit of an acquittal is not the "sole area" in which he operates. His duty is to see to it that the lawful rights and privileges of an accused are not invaded and that he is not convicted except on legal evidence and by due process of law. *State v. Leaks*, 124 *N. J. L.* 261, 265 (*E. & A.* 1940). Moreover, under *Canon* 5 of the *Canons of Professional Ethics:*

"It is the right of the lawyer to undertake the defense of a person accused of crime, regardless of his personal opinion as to the guilt of the accused; otherwise innocent persons, victims only of suspicious circumstances, might be denied proper defense. Having undertaken such defense, the lawyer is bound by all fair and honorable means, to present every defense that the law of the land permits, to the end that no person may be deprived of life or liberty, but by due process of law."

To suggest in a public forum, as the prosecutor did here, that a defense counsel's sole objective in a murder trial is acquittal, is to demean the profession generally and to use the dignity of the prosecutor's office not only to disparage counsel but also the quality of the evidence he has submitted for consideration.

Having thus belittled his adversary, the prosecutor proceeded to glorify his own function. The jury was told that "he is concerned with justice to the defendant and justice to the citizens of the State of New Jersey." He continued:

"Now, that makes his job just a shade different from the defense attorney's. *First, he has to determine whether the facts indicate the guilt or innocence of the defendant. Once that is done the matter is ready for trial.*

But the prosecutor's office is just as much concerned with proving a person innocent as it is proving someone guilty. I don't think there is anything that would satisfy a prosecutor more than to be able to appear before a jury such as you, or prior to getting a jury, that we have uncovered evidence that would say that this particular defendant should not be on trial here before you. This is an ultimate in a prosecutor's life. I also feel that the Judge feels the same way. And as members of the jury you, too, have the same dual func-

tion as does the prosecutor and the court insofar as having to look at both sides of the picture, the innocence side and the guilt side. That is what you have to do, the same as the prosecutor and as the Judge." (Emphasis added)

■ Our cases have held clearly that it is improper for the prosecutor to declare his individual or official opinion or belief of a defendant's guilt in such manner that the jury may understand the opinion or belief to be based upon something which he knows outside the evidence. *State v. McCormack,* 93 *N. J. L.* 287 (*Sup. Ct.*), affirmed 94 *N. J. L.* 262 (*E. & A.* 1919). It is likewise improper to inform the jury that he would not prosecute if he did not believe the defendant to be guilty, unless he makes it perfectly plain that his belief is based solely on the evidence that has been introduced at the trial. *Aponte v. State,* 30 *N. J.* 441, 447 (1959). Basically the reason for the rule is that in the minds of jurors such statements may add the weight of the prosecutor's official and personal influence and knowledge to the probative force of the evidence adduced, thus creating the possibility that the jurors consciously or unconsciously might adopt the prosecutor's view without applying their own independent judgment to the evidence.

The suggestion has been made in this case that the prosecutor's statement, "First, he has to determine whether the facts indicate the guilt or innocence of the defendant. Once that is done the matter is ready for trial," means the prosecutor believed in defendant's guilt from the very inception of the prosecution—that is, after his original and independent investigation was completed—and that the belief was based on that investigation which may have included matters which were not introduced at the trial. In short, the remarks are said to be susceptible of the inference that his belief in guilt was not based solely on the evidence before the jury. In our judgment the statements are worthy of criticism but study of the entire summation gives the impression that the prosecutor indicated to the jury that all the facts he possessed had been submitted, that he had presented

"the facts as far as the state is concerned," and that from the facts in evidence he felt a verdict of murder in the first degree must be returned. Moreover, in appraising the quality of the criticized remarks as between impropriety and plain error, we cannot overlook the failure of counsel to object to them and thus provide the trial court with an opportunity to remedy the situation if he felt the need was present. Such failure gives rise to the influence that in the atmosphere of the trial the defense did not consider the summation out of bounds. *State v. Johnson,* 31 *N. J.* 489, 511 (1960). That form of acquiescence, plus the strong charge of the court that the jurors "with all the strength at [their] command" were "to cast aside from [their] deliberations everything but the evaluation of the evidence," in the light of the whole record, warrants the conclusion that the defendant did not suffer substantial prejudice to his right to a fair trial by reason of the summation.

Our examination of the prosecutor's summation revealed another impropriety which merits discussion, although not warranting a reversal and not called to our attention by defendant as a ground of appeal.

In outlining the facts above we noted that a short time before her death, Mrs. Thornton charged defendant with assault and battery in the Newark Municipal Court and that he was acquitted after trial there. The prosecutor undertook to disparage this acquittal. He said:

"* * * I am sure in your experiences each and every one of you sitting on this jury will know that there are a certain group of people that will go to a police court in the City of Newark and get the brush-off. She got a brush-off down there. And in doing so, when she got this brush-off, that is the reason she is dead—in her grave now."

Defense counsel objected at this point but was overruled. The objection not only should have been sustained but the remarks should have brought down upon the prosecutor the severest kind of censure. In these troubled times particu-

larly, it is inexcusable for a representative of the State, himself directly associated with the administration of law, to charge municipal judges with willful failure to decide justly and in accordance with the evidence whenever a certain class of people is involved.

Supervision and control of all trials are in the hands of the judge. It is essential to the administration of justice that he be acutely responsive to the task. In criminal proceedings particularly, where a person's life or liberty is at stake, whenever a prosecutor exceeds the bounds of propriety or fair play in his summation, the trial court should intervene decisively whether or not an objection is made by the defendant.

Appellate courts continue to be too much occupied in review of prosecutor's summations. In a considerable number of cases we and our predecessors have adjudged statements improper but have not reversed because it could not be said that they reached the quality of impropriety which prejudiced the defendant's right to a fair trial. But such results do not sanction the practice. Our purpose is not to fill the reports with criticisms and admonitions but to instill in the affected persons a realization that ordinary conventions should not be put aside for tactical advantage or lost sight of because of the stress of a trial. We have tried to make it plain that prosecutors should confine their summations to a review of, and an argument on, the evidence, and not indulge in improper expressions of personal or official opinion as to the guilt of the defendant, or in collateral improprieties of any type, lest they imperil otherwise sound convictions. We trust that this opinion marks the last time we shall have to deal with this subject.

## IV.

The final ground for which reversal is sought is that the trial court erred in certain respects in instructing the jury as to the defense of self-defense. The charge dealt at

length with the subject and at its conclusion no objection or criticism was offered by defendant.

No useful purpose would be served in reviewing at length the alleged errors. We have examined the court's exposition of the law of self-defense and find it to be in substantial accord with our recent opinion in *State v. Hipplewith,* 33 *N. J.* 300, 316–318.

## V.

For the reasons expressed the judgment of conviction is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.